UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Garrett E. Brown, Jr. |
| v. | : | Crim. No. 07-454(GEB) |
| WILFREDO BERRIOS,<br> a/k/a "Robo Cop," | : | |
| FRANCISCO HERRERA-GENAO,<br> a/k/a "Fongi," and | : | |
| EFRAIN LYNN,<br> a/k/a "Pepino" | : | |

---

MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO THE PRETRIAL MOTIONS OF DEFENDANT FRANCISCO HERRERA-GENAO

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

Kevin M. O'Dowd
Charles B. McKenna
Assistant U.S. Attorneys

## TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . .   1

Statement of Facts  . . . . . . . . . . . . . . . . . .   2

Argument     . . . . . . . . . . . . . . . . . . . . .   11

    I.     Defendant's Request for Grand Jury Material
       Should be denied . . . . . . . . . . . . . .   11

    II.    The United States Has Complied with its
       Brady Obligations . . . . . . . . . . . . . .   13

    III.   Defendant's Request for Disclosure of out
       of Court Identifications of the Defendant
       Should be Denied . . . . . . . . . . . . . .   16

    IV.    The Defendant Is Not Entitled to Early
       Disclosure of Rule 404(b) Materials . . . . . . . 17

    V.     The Government has Produced Reports of Experts .. 18

    VI.    The Defendant's Request for Disclosure
       of the Names of All Cooperating Individuals
       as Well as Information Regarding Them Is
       Premature . . . . . . . . . . . . . . . . . . 19

    VII.   Defendant's request for Booking Photographs
       Should Be Denied . . . . . . . . . . . . . .   25

    VIII.  Defendant's Request for Discovery Beyond
       Which He Is Entitled Should Be Denied  . . . . .   25

    IX.    The Agents' Rough Notes and Evidence Related
       to this Case Will Be Preserved . . . . . . . .   27

    X.     Defendant has Been Provided with All
       Statements He Made To Law Enforcement . . . . .   27

    XI.    Defendant Herrera-Genao's Statements to
       Law Enforcement Should Not Be Suppressed . . . .   28

    XII.   The Search of The Residence of
       Defendant was Proper . . . . . . . . . . .  . . .   32

XIII.   Statements Made By Defendant On Telephones
        He was instructed Would be Recorded
        Should Not Be Suppressed . . . . . . . . . . .   35

XIV.    Defendant Herrera-Genao's Request for
        A Hearing Regarding the Admissibility of
        Co-conspirator's Statements Should Be Denied .   37

XV.     Defendant's Request for an In Limine
        Ruling Regarding the Admissibility
        of His Prior Convictions is Premature
        and Should be Denied . . . . . . . . . . . . .   39

XVI.    The Matter Should Not be Severed . . . . . . .   41

XVII.   The Warrantless Search of the Defendant
        Herrera-Genao Incident To Arrest Was Proper . .   47

XVIII.  The Automobile Searches Should Not
        Be Suppressed . . . . . . . . . . . . . . . . .   48

XIX.    The Defendant Should not be Permitted
        to File Additional Motions . . . . . . . . . .   48

XX.     The Defendants Should Be Ordered to
        Provide Reciprocal Discovery to the
        United States . . . . . . . . . . . . . . . .   49

Conclusion . . . . . . . . . . . . . . . . . . . . . . .   51

## PRELIMINARY STATEMENT

The United States respectfully submits this memorandum of law in response to pretrial motions submitted by defendant Francisco Herrera-Genao in this case and in support of its cross-motion for reciprocal discovery.  The United States respectfully reserves its right to supplement its responses by oral argument.

## STATEMENT OF FACTS

The instant action arises from a conspiracy on the part of the defendants to commit bank robberies in Middlesex and Ocean Counties in New Jersey.  Defendants picked banks, cased them and planned armed robberies of the banks.  Prior to the robberies, the defendants obtained stolen cars to use in order to avoid detection.  In each robbery certain of the defendants would enter with weapons; first, with a .380 High Point handgun (hereinafter the ".380") and eventually with assault rifles as well.  In each of the robberies, the defendant Francisco Herrera-Genao, also known as "Fongi" (Hereinafter "Herrera-Genao")entered the bank wielding the .380  and in three of the four completed robberies he fired a round from that handgun resulting in two injuries. Herrera-Genao would then demand money from the tellers.

Pursuant to this plan, on or about February 8, 2007, defendant Herrera-Genao along with defendant Wilfredo Berrios, also known as "Robo Cop" (hereinafter "Berrios")robbed the Commerce Bank in Piscataway, New Jersey of approximately $9,609.00.   Herrera-Genao fired the .380 into the ceiling of the bank.  Herrera-Genao then vaulted the counter and ordered a teller put money into a green bag.

On or about February 16, Berrios and Herrera-Genao, along with Efrian Lynn, also known as "Pepino" (hereinafter "Lynn"), robbed the Bank of America in East Brunswick, New Jersey of

approximately $28,980. Herrera-Genao and Lynn entered the bank and as in the Commerce Bank robbery, Herrera-Genao fired the .380 handgun into the ceiling. Again he vaulted the teller counter and demanded that the tellers put money into the bag. In both robberies Berrios drove the getaway car.

On or about March 2, 2007, Berrios, Herrera-Genao and Lynn robbed the Bank of America in Ocean Township, New Jersey. Berrios and Herrera-Genao went into the bank. Berrios carried an assault rifle and Herrera-Genao carried the .380. As in the earlier robberies, Herrera-Genao jumped over the teller counter[1] and ordered the teller to put money in the bag, threatening the teller that if the police arrived before he left, he would kill her. Lynn drove the getaway car. The robbery netted defendants approximately $15,960.00.

On or about March 16, 2007, Berrios, Herrera-Genao and Lynn, along with another individual, Michael Cruz (hereinafter "Cruz"), who pled guilty before this Court to bank robbery and weapons charges, robbed the Bank of America in South Brunswick, New Jersey. Berrios, Herrera-Genao and Lynn entered the bank. Berrios and Lynn each wielded an assault rifle and Herrera-Genao carried the .380. Herrera-Genao jumped over the teller counter and ordered a teller to fill the bag he was carrying with money.

---

[1] Of the four completed bank robberies, this was the only one that a shot was not fired by the defendant.

- 3 -

The teller apparently did not act with sufficient alacrity for Herrera-Genao who fired the .380, shattering a glass partition and injuring the teller who was then bleeding from the face.  The defendants fled with approximately $33,066.  Cruz drove the getaway car.

On or about April 5, Agents of the Federal Bureau of Investigation ("FBI") surveilled defendant Berrios.  At approximately 9:00 a.m. Berrios was observed entering a white Acura vehicle (hereinafter the "White Acura").  The White Acura proceeded to Herrera-Genao's residence where three individuals were seen entering the White Acura.  At approximately 10:30 a.m. the White Acura was observed in a parking lot in the vicinity of Bloomingdales Department store in Bridgewater, New Jersey. Shortly thereafter, a black Honda Civic, model year 2000 (the "Black Honda") was parked adjacent to the White Honda.  At approximately 10:50 a.m. the Black Honda, which had been stolen earlier in the day from the Bridgewater Mall, and the White Acura were observed traveling in tandem to the ShopRite located on Route 22 in the vicinity of the Raritan Valley Community College. Shortly thereafter the three individuals left the Black Honda at the ShopRite and were observed traveling westbound on Route 22 in the vicinity of several banks.

At approximately 11:19 on April 5, 2007, the White Acura was observed back at the ShopRite parking lot in the vicinity of the

- 4 -

Black Honda.  The Black Honda and the White Acura where observed shortly thereafter parked side-by-side with all the individuals outside the vehicles.

At approximately 11:20 a.m. the Black Honda and White Acura were again observed traveling in tandem westbound on Route 22. As some point the White Acura exited Route 22 and parked in a parking lot within view of the PNC Bank located on Route 22 in Whitehouse, New Jersey.  The Black Honda was observed traveling to the PNC Bank with two individuals in the vehicle.  Upon arriving at the bank, agents moved in to arrest Berrios and Herrera-Genao who were in the Black Honda. Berrios was seated in the car with the .380 between his legs.  Herrera-Genao got out of the car and ran from the agents and was not arrested until the following day.  Berrios was taken into custody at the scene.  The Black Honda was searched and, in addition to the .380, two assault weapons, ammunition, masks of the type used by all of the robbers in the earlier robberies and the green sack into which the stolen money was placed[2] were recovered.

Almost simultaneous to the arrest of Berrios and the fleeing of Herrera-Genao, another team of FBI agents effected the arrest of Cruz who was in the White Acura.  Tragically, while making the arrest of Cruz an FBI agent was shot and killed.  Preliminary

---

[2] The Black Honda that Berrios and Herrera-Genao were in when Berrios was arrested was searched pursuant to a search warrant issued by Magistrate Judge Madeline Cox-Arleo.

reports have indicated that the cause of the Agent's death was not due to any guns fired by the defendants.  None of the defendants have been charged with the agent's death[3].

The White Acura and Black Honda were searched pursuant to Court Ordered warrants as were the homes of Berrios, Herrera-Genao, Lynn and Cruz[4].  The searches of the residences of Berrios and Herrera-Genao yielded large amounts of cash.  Money straps, ammunition and clothing similar to that worn by the robbers was also seized.  Ballistics tests on the .380 have revealed that it was the weapon fired in each three of the bank robberies. Herrera-Genao and Lynn gave full statements to FBI agents following the execution of waiver of Miranda forms.

Based upon this and other information, on June 1, 2007, a grand jury sitting in Newark, New Jersey returned an 11 Count indictment charging the defendants with conspiracy to commit bank robbery in violation of 18 U.S.C. § 371; bank robbery and aiding and abetting in violation of Title 18, U.S.C. §§ 2113 and 2; and

---

[3]  While the Government does not intend to raise the death of the agent during the trial in this matter, the Government will seek to apply the cross reference in 2B3.1 of the United States Sentencing Guidelines which states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C.§ 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States apply § 2A1.1 (First Degree Murder)" at sentencing.

[4]  In addition, a voice mailbox subscribed to Berrios and a cellular telephone found in the White Acura were also searched pursuant to a court ordered warrant.

- 6 -

wilfully using and carrying a firearm in furtherance of the bank robberies in violation of 18 U.S. C. §§ 924 and 2. Defendants Berrios and Herrera-Genao are charged with five counts of substantive bank robbery and aiding and abetting and five counts of wilfully using and carrying a firearm in furtherance of the bank robberies. Lynn was charged with three counts of substantive bank robbery and aiding and abetting and three counts of wilfully using and carrying a firearm in furtherance of the bank robberies he engaged in[5].

Following the arraignment of the defendants on June 11, 2007, the Court entered its Standing Order for Discovery and Inspection. Consistent with Court's order and Rule 16 of the Federal Rules of Criminal Procedure, the United States made discovery available to the defendants including:

1. Statements of the defendants;

2. The defendants' criminal records to the extent applicable;

3. The search warrant affidavit;

4. Surveillance videos;

5. Scientific reports.

In addition, on June 15, 2007, the Government met with the

_____

[5] On February 1, 2008 the grand jury returned a Superseding Indictment which did not alter any of the charges in a substantive way. The defendant's motion was filed prior to the Superseding Indictment being logged on in the electronic filing system.

attorneys for the defendants and made available for them the
items seized from the searches of the cars and the residences of
the defendants as well surveillance videos and still photographs.
The Government also provided to defendant Herrera-Genao tapes of
recordings made by prison officials of telephone calls he placed
from prison.  The recordings document the fact that each time the
defendant made a call from prison he was notified that all calls
were recorded.

The United States also informed defendants on June 20, 2007
that it was not then aware of any exculpatory evidence within the
purview of <u>Brady v. Maryland</u>, except to the extent that the
statements included in the aforementioned discovery list
represented such evidence.

Defendants Berrios and Lynn filed a variety of pretrial
motions which, save for the admissibility of their statements,
the Court has ruled upon.  Defendant Herrera-Genao has now made
his pretrial motions seeking the following relief as expressly
addressed in his memoranda of law:

1.  Requiring the Government to provide grand jury
transcripts of all witnesses who testified in connection with the
Indictment in this case;

2.  Requiring the Government to provide all Brady material,
"including information ... with respect to cooperating witnesses
and confidential informants used in connection with this case

- 8 -

[including] relevant law enforcement personnel and out-of-court identifications;"

3. Requiring the Government to provide all information in its possession concerning identifications by anyone of the defendant, including, but not limited to, photographic identification;

4. Requiring disclosure of all 404(b) evidence the Government anticipates using at trial;

5. Requiring production of all reports of experts the Government intends to use at trial;

6. Requiring the Government to provide the names of all cooperating individuals utilized in this matter as well as information and regarding these individuals;

7. Requiring the Government to provide booking photographs of all cooperating individuals;

8. Requiring the Government to disclose all information concerning circumstances leading up to and surrounding the seizures made in this case pursuant to Fed. R. Crim P. 12(b)(4);

9. Requiring the Government to preserve agents' rough notes;

10. Requiring the Government to provide defendant with all statements he made;

11. Seeking suppression of any statements defendant Francisco Herrera-Genao made to law enforcement;

- 9 -

12. Seeking suppression of any evidence seized from defendant's residence pursuant to a search warrant;

13. Seeking suppression of any and all telephone conversations defendant Francisco Herrera-Genao engaged in while incarcerated;

14. Requesting a hearing to determine the admissibility of statements made by co-conspirators pursuant to <u>Bruton v. United States</u>;

15. Requesting a hearing to determine the admissibility of defendant's prior convictions;

16. Requiring severance for the trial of co-defendants;

17. Seeking suppression of the warrantless search incidental to defendant Herrera-Genao's arrest;

18. Seeking suppression of warrantless searches of the automobiles allegedly used by defendant Francisco Herrera-Genao and;

19. Seeking permission fo file additional motions as tne need arises.

For the reasons set forth below, the United States asserts that the motion for Brady material is moot; and the motions to preserve agents' notes, should be granted. All of defendant's other motions should be denied.

<u>ARGUMENT</u>

I.   Defendant's Request for Grand Jury
     <u>Material Should Be Denied.</u>

Defendant Herrera-Genao has move for the disclosure of grand

jury materials based upon the bare assertion that "[t]his

testimony is necessary so that the defendant can properly

evaluate the credibility of witnesses against him."   Herrera-

Genao Mem. at 6.   In doing so, defendant Herrera-Genao has failed

to set forth the appropriate standard for the disclosure of grand

jury materials, he has failed to satisfy that standard, and he

has failed to acknowledge – let alone distinguish – unfavorable,

binding precedent in the Supreme Court and this Circuit.   In

particular, defendant Herrera-Genao has not shown with

particularity a need for the grand jury materials that "outweighs

the public interest in secrecy."   <u>United States v. McDowell</u>, 888

F.2d 285, 289 (3d Cir. 1988).   Accordingly, this Court should

deny his motion.

A generalized hope that the grand jury materials might

reveal grounds for a defense does not justify disregarding the

secrecy of grand jury proceedings.   A defendant's desire to

engage in a fishing expedition does not justify disregarding the

secrecy of grand jury proceedings.   <u>See</u> <u>Thomas v. United States</u>,

597 F.2d 656, 658 (8th Cir. 1979) (explaining that "an expression

of a generalized hope by [defendant] that he might find some

defect in the grand jury proceedings" is a "fishing expedition[]"

that does "not provide sufficient grounds for disclosure [of grand jury transcripts] prior to or at trial").

The need for secrecy of grand jury proceedings is well-established.  See, e.g., Douglas Oil Co. v. Petrols Stops Northwest, 441 U.S. 211, 218 (1979).  As the Supreme Court emphasized in Douglas Oil Co., "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  Id.  Although the need for secrecy diminishes "when the grand jury whose transcripts are sought has concluded its operations," the interests in maintaining confidentiality remain.  Id. at 223.  (recognizing that there are possible detrimental effects "upon the functioning of future grand juries," including the possibility that witnesses may be hesitant to testify if they know their testimony will one day be disclosed).

Given the "indispensable secrecy of grand jury proceedings," disclosure of grand jury materials is not warranted unless "there is a compelling necessity" that is "shown with particularity." United States v. Proctor & Gamble Co., 356 U.S. 677, 681 (1958). In United States v. McDowell, this Court explained that "[t]o support a motion for judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy."  888 F.2d 285, 289 (3d Cir. 1988).   The burden of proof is on the

party seeking disclosure - in this case, the defendant - to show a particularized need.  See Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400 (1959) ("The burden [] is on the defense to show that 'a particularized need' exists for the [grand jury] minutes that outweighs the policy of secrecy.").

As stated above, the defendant has not shown a particularized need that justifies the disclosure of grand jury materials.  Accordingly, this Court should deny his motion.


## II.  The United States Has Complied With its Brady Obligations.

The defendant seeks disclosure of all Brady, including "all evidence which is favorable and material to [the defendant] which would exculpate him or mitigate his culpability."  Memorandum of defendant at p. 2.  By his request, although it is styled as a request for Brady materials, the defendant seeks disclosure at this time of all Giglio material on Government witnesses.  In this, defendant goes too far.

The United States is fully aware of its obligations to disclose all exculpatory material as well as evidence that may be used to impeach the credibility of all government witnesses. Giglio v. United States, 405 U.S. 150, 154 (1972); Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Standing Order entered in this matter (reiterating the government's obligations under Brady).  The Government has complied with the Court's Discovery

- 13 -

Order and fully intends to continue complying should exculpatory material come into its possession.

It must be noted, however, that disclosure of evidence that may be used to discredit government witnesses is not directly exculpatory and need not be disclosed well in advance of trial. The Court of Appeals for the Third Circuit stated in United States v. Higgs, 713 F.2d 39, 42 (3d Cir. 1983), cert. denied, 464 U.S. 1048 (1984), that disclosure of witness credibility evidence at the time of trial sufficiently insures a defendant's right to a fair trial. The appellate court specifically stated that:

> . . . No denial of due process occurs if Brady material is disclosed to [the defendant] in time for its effective use at trial . . . The Brady material in this case was information that [the defendant] could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think [the defendant's] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses.

Id. at 448. Consistent with this view, federal courts routinely have refused to order pretrial production of Giglio materials. See, e.g., United States v. Martino, 648 F.2d 367, 384 (5th Cir. 1981) (en banc) (evidence concerning competency of key government witness provided at time he testified), cert. denied, 456 U.S. 943 (1982); United States v. Rinn, 586 F.2d 113, 119 (9th Cir. 1978), cert. denied, 441 U.S. 931 (1979); United States v.

- 14 -

Litman, 547 F. Supp. 645, 653 (W.D. Pa. 1982), aff'd, 661 F.2d 17 (3d Cir. 1983); United States v. Frumento, 405 F. Supp. 23, 32 (E.D. Pa. 1975) (refusing to order pretrial disclosure of criminal records); United States v. Mitchell, 372 F. Supp. 1239, 1257 (S.D.N.Y. 1973) (impeachment materials need not be disclosed until prior to each witness's testimony); see also United States v. Westmoreland, 41 F.R.D. 419, 427 (S.D. Ind. 1967); United States v. Johnson, 298 F. Supp. 58, 65 (N.D. Ill. 1969).

In a case such as this, where there are no special circumstances requiring early disclosure of impeachment material, the only apparent need for pretrial disclosure is to learn the identity of government witnesses through the "back door."  The Third Circuit and other courts have repeatedly held that requests for discovery cannot properly be used to obtain a list of government witnesses.  See Government of the Virgin Islands v. Ventura, 476 F.2d 780 n.1 (3d Cir. 1973); United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971), cert. denied, 405 U.S. 936 (1972); United States v. Cole, 449 F.2d 194, 198 (8th Cir.), cert. denied, 405 U.S. 931 (1971).  As one Court noted, it "follows that if [a] court would not order production of a list of the government's witnesses, it would not order production of their criminal records, if any."  Westmoreland, 41 F.R.D. at 427.

While there is no provision for early production of Giglio material, the United States proposes to provide such material, to

- 15 -

the extent it exists, when it disseminates the <u>Jencks</u> material to the defense -- no later than one day before the witness in question testifies at trial.  Disclosure in this manner should be more than adequate to afford defense counsel time to prepare for cross-examination, to prevent unnecessary delays in the trial, and to satisfy the defendant's due process rights.  <u>See</u> <u>Higgs</u>, 713 F.2d at 44; <u>United States v. Kubiak</u>, 704 F.2d 1545, 1549-50 (11th Cir.), <u>cert.</u> <u>denied</u>, 464 U.S. 852 (1983); <u>United States v.</u> <u>Kopituk</u>, 690 F.2d 1289, 1337-41 & n.47 (11th Cir. 1982), <u>cert.</u> <u>denied</u>, 461 U.S. 928 (1983).  <u>See</u> <u>also</u> <u>United States v. Starusko</u>, 729 F.2d 256, 261 (3d Cir. 1984) (encouraging early production of <u>Brady</u> and <u>Giglio</u> materials).

Accordingly, the Court should deny the defendant's motion for early disclosure of impeachment materials.

### III. Defendant's Request for Disclosure of out of Court Identifications of the Defendant Should be Denied.

Defendant has requested that the Court hold a hearing on whether any in-court identification of the defendant was tainted by any out-of-court identification of him.  Defendant cites two cases in his memorandum of law; <u>Simmons v. United States</u>, 390 U.S. 377 (1968) and <u>William v. Lockhart</u>, 736 F.2d 1264 (8th Cir. 1984).  In both cases, even where photos of the defendants were shown to the victims who later identified those same defendants in court, the Courts permitted the identification.  In this case,

if the Government seeks to introduce an in-court identification
of defendant by a witness who places the defendant at the scene
of the crime, it will inform defense counsel of any material the
witness may have been shown prior to the testimony of the witness
so that counsel may request a hearing.  Defendant's request at
this time is premature and should be denied.

### IV. The Defendant Is Not Entitled to Early Disclosure of Rule 404(b) Materials.

The defendant seeks pretrial disclosure of the Government's
intention to rely upon any evidence of other crimes, wrongs or
acts that the Government intends to introduce at trial pursuant
to Federal Rule of Evidence 404(b).  The United States is mindful
of its responsibilities under Rule 404(b).  Therefore, the United
States will provide reasonable notice in advance of trial of the
general nature of any evidence of other crimes, wrongs or acts
contemplated by Fed. R. Crim. P. 404(b) that it may seek to
introduce.  The United States, however, specifically reserves its
right to seek to introduce any evidence of other crimes, wrongs
or acts contemplated by Rule 404(b) during the trial, without
having first given notice to defendant, upon a showing of good
cause, satisfactory to the Court.  Defendant's request that the
Government immediately turn over any Rule 404(b) materials goes
too far.  For this reason and subject to the Government's
obligations set forth above, defendant's motion should be

- 17 -

denied.[6]

V.   The Government has Produced Reports of Experts.

Defendant requests discovery of all scientific and expert reports or test results as well as a summary of the testimony which the Government intends to introduce through expert witnesses.  As of this date, the Government has produced to defendant reports dealing with DNA, footprints, ballistics, glass fragments and latent fingerprints.  The testimony of the experts will be consistent with the findings in those reports.  If additional reports are generated and additional experts will testify, appropriate reports will be disclosed to defendant. Accordingly defendant's motion should be denied[7].

----

[6] To the extent such evidence will be offered by the Government in its case in chief, the United States will move the court for an in limine ruling on its admissibility prior to the start of trial.  Relatedly, prior arrests and convictions may become relevant in the event that a defendant testifies.  A determination of admissibility regarding impeachment and rebuttal matters cannot properly be made without the factual context provided by the defendant's actual testimony.  Luce v. United States, 469 U.S. 38, 41 (1984); United States v. Johnston, 543 F.2d 55, 59 (8th Cir. 1976); United States v. Bianco, 419 F. Supp. 507, 508 (E.D. Pa. 1976), aff'd, 547 F.2d 1164 (3d Cir. 1977).  See also United States v. Vastola, 670 F. Supp. 1244, 1268 (D.N.J. 1987), aff'd in part, rev'd in part on other grounds, 899 F.2d 211 (3d Cir. 1990) (the balance between the prejudicial effect and the probative value of such evidence "is most effectively done at trial when such evidence can be evaluated in the context of the government's case and the defense put forward . . . .").

[7] The Government will provide to defense counsel, prior to trial, the qualifications of any expert it intends to call.

VI.   The Defendant's Request for Disclosure of
      the Names of All Cooperating Individuals as
      Well as Information Regarding Them Is Premature.

Defendant Herrera-Genao also seeks disclosure of the identities of all cooperating individuals as well as information relating to each such person along with the opportunity to interview them.  In support of this request, the defendant relies upon Roviaro v. United States, 353 U.S. 53, 59 (1957).  The Government will first discuss the disclosure of the identity of confidential informants and then general matters dealing with Jencks disclosure.

A.   The Government Need Not Disclose the
     Identity of Confidential Informants At This Time.

In Roviaro, the Supreme Court, recognizing the legitimate law enforcement need to protect the identity of persons who provide information to law enforcement officers, held there was a qualified privilege preventing disclosure of such information based upon the public's right and the legitimate law enforcement interest in information provided by informants.  The Court, however, noted that, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege [against disclosure] must give way."  353 U.S. at 60-61.  The burden is on the defendant to show a specific need for disclosure, and such needs may not rest on speculation.  United States v. Jiles, 658 F.2d

- 19 -

194, 197 (3d Cir. 1981), <u>cert</u>. <u>denied</u>, 455 U.S. 923 (1982).  <u>See</u>
<u>also</u> <u>Roviaro</u>, 353 U.S. at 60-61; <u>McCray v. Illinois</u>, 386 U.S. 300
(1967); <u>United States v. Bozzano</u>, 712 F.2d 826, 839 (3d Cir.
1983), <u>cert</u>. <u>denied</u>, 465 U.S. 1078 (1984) (where informant
provides agents with probable cause to conduct a search,
disclosure of his identity is not required).

In determining whether disclosure is appropriate, the court
must balance "the public interest in protecting the flow of
information against the individual's right to prepare his
defense." 353 U.S. at 62; <u>Jiles</u>, 658 F.2d at 196.  This
balancing must not be done in a vacuum; rather, a court must view
the particular circumstances of a particular case, "taking into
consideration the crime charged, the possible defenses, the
possible significance of the informer's testimony, and other
relevant factors." 353 U.S. at 62; <u>Jiles</u>, 658 F.2d at 196.

In <u>Jiles</u>, the Court set guidelines for implementing
<u>Roviaro's</u> rule and acknowledged that, in this area, one of three
types of cases may emerge, and each type is treated consistently
with the level of the defendant's need.  On the one extreme are
cases in which an informant may have played "an active and
crucial role in the events underlying the defendant's criminal
liability."  In these cases, depending on the balance among the
critical factors, disclosure is most probably required to assure
a fair trial.  <u>Jiles</u>, 658 F.2d at 196-97.  On the other extreme

are the cases in which the informant was not an active
participant or eye witness but was merely a "tipster."  In these
cases, disclosure generally need not be made.  <u>United States v.
Moreno</u>, 588 F.2d 490, 494 (5th Cir.), <u>cert</u>. <u>denied</u>, 441 U.S. 936
(1979).  The remainder of the cases fall between these two
extremes, and in these cases, the court must weigh all relevant
factors to determine whether disclosure is appropriate.

In this latter context, a court must examine the "need, if
any, which the defendant has alleged for disclosure," and the
burden falls upon a defendant to establish that need.  <u>Id.</u>  Mere
speculation that the informant may have some evidence helpful to
a defendant's case is not sufficient to show the specific need
under <u>Roviaro</u>.  Rather, the defendant must <u>show</u> that the
informant has potentially exculpatory information or that the
informant himself has participated in the criminal activity.
<u>Bazzano</u>, 712 F.2d at 839.

For example, in <u>Roviaro</u>, 353 U.S. at 63-65, which required
disclosure, the Court found that:  (1) the possible testimony was
highly relevant to the issues on trial;  (2) the testimony might
have served as the basis for an entrapment defense;  (3) it might
have thrown doubt on the defendant's identity; and  (4) the
informant was the only person other than the defendant who
participated in the charged offense.  For those reasons, it was
clear that the interests in a fair trial outweighed the

- 21 -

government's right to protect the informant.

The law, therefore, is clear that a defendant is entitled to disclosure of an informant's identity under only limited circumstances and, in such cases only when it has articulated a non-speculative need for disclosure.  A review of the defendant's submission reveals that it is wholly devoid of any facts or even speculation that: a) there were any confidential informants; or b) there is a need for disclosure.  This utter lack of any basis whatsoever for the information it seeks is wholly insufficient to require the Government to disclose the informant's identity, Jencks and/or Giglio material, to the extent same exists, well in advance of trial.  The United States will confirm any informant's identity and the related written materials in the same manner and at the same time it releases its Jencks/Giglio material  - - not later than one day before the witness testifies.  The movant have failed to justify earlier disclosure.

Accordingly, because the defendant seeks disclosure of information to which he is not otherwise entitled, pretrial, pursuant to the principles set forth in the portions of this brief dealing with the Government's Jencks and Giglio obligations, the defendant's request for pretrial disclosure of the confidential informant's identity and impeachment material is premature and should be denied.

B.    The Government Need Not Disclose
      Jencks Material At This Time.

The defendant also seeks to compel the Government to disclose all Jencks Act material substantially before the start of trial.  This request is without legal basis.

The Jencks Act, 18 U.S.C. § 3500 (the "Act"), was enacted to set limits on pretrial discovery of prior witness statements in criminal cases.  The Act reflects a legislative determination that a criminal defendant is entitled to use such statements for impeachment purposes during cross-examination, but not for pretrial preparation.  See Palermo v. United States, 360 U.S. 343, 349 (1959); United States v. Murphy, 569 F.2d 771, 773 (3d Cir.), cert. denied, 435 U.S. 955 (1978).  Under the Act, the Government may not be compelled to produce prior statements of Government witnesses at any time before the end of the witness's direct examination.  See 18 U.S.C. § 3500.

Specifically, the Act provides:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

Id. (emphasis added).  The United States Supreme Court and the Third Circuit both have confirmed that Jencks Act material need not be produced until after the witness testifies at trial.  See

- 23 -

Palermo, 360 U.S. at 349; United States v. Starusko, 729 F.2d 256, 263 (3d Cir. 1984); Murphy, 569 F.2d at 773; United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972). Moreover, our Court of Appeals has held that ordering early disclosure of such material constitutes an abuse of discretion. United States v. Higgs, 713 F.2d 39, 44-45 (3d Cir.), aff'd, 464 U.S. 1048 (1984); Murphy, 596 F.2d at 773; Kenny, 462 F.2d at 1212; United States v. Scolnick, 392 F.2d 320, 327 (3d Cir. 1968).

In pushing for early disclosure of Jencks materials, defendant may be seeking to force the United States to identify its witnesses in advance of trial. It is well established, however, that "the [criminal] discovery rules do not permit the defense to get the names of witnesses." United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir.), cert. denied, 429 U.S. 1099 (1977); see Virgin Islands v. Ventura, 476 F.2d 780, 781 n.1 (3d Cir. 1971); United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971), cert. denied, 405 U.S. 936 (1972).

Nonetheless, in view of the scope of this case, the United States voluntarily agrees to provide all Jencks material one day prior to the witness's testimony. Such early production of Jencks material more than satisfies defendant's due process rights to a fair and just trial. See Higgs, 713 F.2d at 44; United States v. Kubiak, 704 F.2d 1545, 1549-50 (11th Cir.), cert. denied, 464 U.S. 852 (1983); United States v. Kopituk, 690

F.2d 1289, 1337-41 & n.47 (11th Cir. 1982).

The Government respectfully submits that no court order is necessary concerning this issue.

### VII. Defendant's request for Booking Photographs Should Be Denied.

Defendant seeks the booking photographs of all cooperating individuals in this case less any personal information regarding any such individuals. As set forth in point VI. above, the Government is not required to disclose the identities of cooperating individuals, if any, at this time. Seeking photographs of individuals that defendant is not entitled to know the identities of calls for the production of information through the back door. Accordingly, this request as well should be denied.

### VIII. Defendant's Request for Discovery Beyond Which He Is Entitled Should Be Denied.

Defendant seeks discovery pursuant to Fed. R. Crim. P. 12 (b)(4) which states:

> (A) At the Government's Discretion. At the arraignment or as soon afterward as practicable, the government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C).

> (B) At the Defendant's Request. At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to

> suppress evidence under Rule 12(b)(3)(C), request
> notice of the government's intent to use (in its case-
> in-chief at trial) any evidence that the defendant may
> be entitled to discover under Rule 16.

This Court's Standing Order requires the Government to pre-mark

its exhibits 30 prior to the date set for trial. This Order

provides the defense with sufficient time in advance of trial to

move the Court to exclude any evidence for which it has grounds

to seek such relief.  Accordingly, the motion is premature and

should be denied.

In addition to seeking evidence the Government intends to

use in it's case-in-chief, defendant seeks, pursuant to this same

Rule, "any documentation of the circumstances leading up to and

surrounding the execution of the searches [of defendant's

residence] and seizures including, but not limited to, warrant

applications, supporting affidavits and statements of witnesses

who participated in or were present at the searches." (Herrera-

Genao Mem. At p.17).  Defendant also seeks, "information

concerning searches directly related to the defendant, that is to

say, the searches o the six(6) automobiles involved in this

case." (Herrera-Genao Mem. At p. 18).  First, as is pointed out

by the defendant in his memorandum at page 5, search warrant

affidavits have been provided to defense counsel in this matter.

More importantly, Fed. R. Crim. P. 12(b)(4) deals only with

evidence the Government intends to use in its case-in-chief.

Defendant here seeks information well beyond that which is

- 26 -

permitted by the Rule.  As is set forth above, the Government
will adhere to this Court's Standing Order which provides him
with the relief he seeks under the Rule.  To the extent he seeks
anything more, his motion should be denied.


        IX.  The Agents' Rough Notes and Evidence Related
             To this Case Will Be Preserved.

     The defendant requests that the United States preserve and
retain the notes of law enforcement agents.  The United States is
aware of its obligations under <u>United States v. Vella</u>, 562 F.2d
275 (3d Cir. 1976), <u>cert</u>. <u>denied</u>, 434 U.S. 1074 (1978).
Therefore, to the extent such notes exist, the United States will
direct its agents to preserve their rough notes.  To the extent
that the defendant seeks such information at this time, his
request should be denied for the same reasons set forth in point
V.(B) above regarding Jencks Act materials.

     Accordingly, this motion is moot and should be denied.


        X.  Defendant has Been Provided with All
            Statements He Made To Law Enforcement.

     Defendant requests that "any statements attributable to the
defendant" be produced to him.  (Herrera-Genao Mem. At p. 19).
Rule 16 of the Federal Rules of Criminal Procedure requires the
production by the Government of "the substance of any relevant
oral statement made by the defendant, before or after arrest, in

- 27 -

response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Rule 16 also requires the Government to provide the defendant with any relevant written or recorded statements in its possession, custody or control.  The Government has already made this material available to the defendant as required by Rule 16. To the extent the defendant seeks discovery beyond Rule 16, the Government is not required to provide such material. Accordingly, his motion in this regard should be denied.

### XI.  Defendant Herrera-Genao's Statements to Law Enforcement Should Not Be Suppressed.

After his arrest on April 6, 2007, Herrera-Genao was given his Miranda warnings by the arresting agents, voluntarily waived his rights in writing and was then questioned.  The waiver of his Miranda rights was provided to defendant during discovery. Herrera-Genao now seeks suppression of his post-arrest statement without giving any reason and without claiming any impropriety on the part of law enforcement or lack of voluntariness on his part. Accordingly, defendant's motion should be denied.

A.  Standard for Granting a Request for a Hearing.

The burden of proof is on a defendant who seeks to suppress evidence.  United States v. Feldman, 606 F.2d 673 (6th Cir. 1979), cert. denied, 445 U.S. 961 (1980); United States v. Evans, 572 F.2d 455 (5th Cir.), cert. denied, 439 U.S. 870 (1978);

- 28 -

United States v. Galente, 547 F.2d 733 (2d Cir. 1976), cert.
denied, 431 U.S. 969 (1972); United States v. Phillips, 540 F.2d
319 (8th Cir.), cert. denied, 429 U.S. 1000 (1976).  Only after a
defendant establishes a factual basis for a suppression motion
does the burden shift to the Government to prove, by a
preponderance of the evidence, that the evidence is admissible.
United States v. Matlock, 415 U.S. 164, 177 (1974); United States
v. Williams, 604 F.2d 1102 (8th Cir. 1979); United States v.
Sacco, 563 F.2d 552 (2d Cir.), cert. denied, 434 U.S. 1039
(1977); United States v. De La Fuente, 548 F.2d 528 (5th Cir.),
cert. denied, 431 U.S. 932 (1977).  Accordingly, an evidentiary
hearing on a suppression motion "should not be set as a matter of
course, but only when the [motion] alleges facts which if proved
would require the grant of relief."  Grant v. United States, 282
F.2d 165, 170 (2d Cir. 1960).  See also United States v.
Harrelson, 705 F.2d 733, 737 (5th Cir. 1983).  "[T]he allegations
in the moving papers . . . [must be] sufficiently definite,
specific, detailed, and nonconjectural, to enable the court to
conclude that a substantial claim is presented and that an
evidentiary hearing is therefore appropriate."  Cohen v. United
States, 378 F.2d 751, 760 (9th Cir.), cert. denied, 389 U.S. 897
(1967).  See also United States v. Poe, 462 F.2d 195 (5th Cir.
1972), cert. denied, 414 U.S. 845 (1973); United States v.
Losing, 539 F.2d 1174 (8th Cir. 1976), cert. denied, 434 U.S. 969

- 29 -

(1978).  As the Supreme Court has cautioned, "claims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting" the prosecution's case in advance of trial.  <u>Nardone v. United States</u>, 308 U.S. 338, 342 (1939).  "[A]llegations which are general and conclusory or based upon suspicion and conjecture will not suffice" to meet the <u>Nardone</u> standard of "solidity" for ordering an evidentiary hearing.  <u>Cohen</u>, 378 F.2d at 751.

In this case, Herrera-Genao has failed to put forth any explanation regarding why his post-arrest statement may be subject to suppression.  The United States has conformed to this Court's Standing Discovery Order as well as Rule 16 of the Fed. R. Crim. P. and is not obliged to advise the defendant of its intention regarding the usage of same, if at all.  Thus, absent a basis for a challenge to the admissibility of the above-mentioned items, the request for a hearing on the issue of admissibility should be denied.

B.   <u>Admissibility of Herrera Genao's Post-Arrest Statement</u>

Defendant Herrera-Genao has asked the Court to conduct, pretrial, an evidentiary hearing regarding the voluntarily nature of his statement and for an <u>in limine</u> ruling on the admissibility of his post-arrest statement.  Since, he has not carried his burden of articulating a factual basis for the request, their request for such a hearing should be denied.

- 30 -

The United States acknowledges, however, its burden of proving by a preponderance of the evidence that the defendant was advised of his legal rights and voluntarily elected to waive them.  See Lego v. Twomey, 404 U.S. 477 (1972).  The United States will make such a showing before offering the statements into evidence, if in fact it decides to seek their introduction. In such a case, the United States will specifically prove, through the testimony of law enforcement agents, that the defendant was advised of his constitutional rights[8] and, before being asked any questions, he knowingly and voluntarily waived them.[9]  The law is clear that a defendant's "subsequent willingness to answer questions after acknowledging that [he] understood [his] Miranda rights is sufficient to constitute an implied waiver . . . . " United States v. Velasquez, 626 F.2d 314, 320 (3d Cir. 1980); see North Carolina v. Butler, 441 U.S. 369 (1979); United States v. Cruz, 910 F.2d 1072, 1079-80 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991)("requiring an affirmative waiver could seriously inhibit the ability of police

---

[8] See Duckworth v. Eagan, 492 U.S. 195, 109 S.Ct. 2875, 2880 (1990) (approving the recitation of the functional equivalent of the Miranda warnings from memory so long as the warnings given "reasonably convey to [the defendant] his rights as required by Miranda."); United States v. Cruz, 910 F.2d 1072, 1078-79 (3d Cir. 1990), cert. denied, 111 S.Ct. 709 (1991).

[9] See, e.g., United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989)(setting forth a synopsis of the law regarding waiver), cert. denied, 494 U.S. 1017 (1990).

- 31 -

officers to do essential investigative work . . . ."). If the defendant knowingly and voluntarily waived his <u>Miranda</u> rights, the post-arrest statement is admissible against him.

If the United States chooses to introduce defendant's statement in its case-in-chief, it will be prepared to prove and thereby satisfy the Court that the statement was voluntarily made, obtained in accordance with the dictates of <u>Miranda</u>, and are therefore admissible. Hence, defendant's motion to suppress post-arrest statements should be denied.

### XII. The Search of The Residence of Defendant was Proper.

Defendant Herrera-Genao seeks to suppress the fruits of the search of his residence which search was conducted pursuant to valid, court-authorized warrant issued by United States Magistrate Judge Madeline Cox-Arleo. Defendant cites to no deficiency in the warrant, application or affidavit that support its issuance. Indeed, all defendant states is that he requests a hearing "to determine the sufficiency and veracity of the search warrant." (Herrera-Genao Mem. at p. 21). Thus, defendant is essentially seeking to embark on an expedition to fish. Accordingly, his motion should be denied.

Defendant's argument that the affidavit lacks probable cause fails. Probable cause is determined by a totality of the circumstances test. <u>United States v. Williams</u>, 124 F.3d 411, 419

- 32 -

(3d Cir. 1997), cert. denied, 522 U.S. 1051 (1998).  In
determining whether there is probable cause based upon the facts
contained in an affidavit, this Court must give deference to the
initial determination made by the magistrate judge.  United
States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993); see also
United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001)
(explaining that the Court of Appeals "must, like the district
court, give great deference to the magistrate judge's probable
cause determination").

     The task of the issuing magistrate is simply to determine
whether there is a "fair probability that contraband or evidence
of a crime will be found in a particular place."  Id.  The
reviewing court is "to uphold the warrant as long as there is a
substantial basis for a fair probability that the evidence will
be found."  Id.  Although "in a particular case it may not be
easy to determine when an affidavit demonstrates the existence of
probable cause, the resolution of doubtful or marginal cases in
this area should be largely determined by the preference to be
accorded to warrants."  United States v. Ventresca, 380 U.S. 102,
109 (1965); accord Hodge, 246 F.3d at 305.  Finally, in making
this determination, the affidavit must be read in a common sense
and nontechnical manner.  Williams, 124 F.3d at 420; Conley, 4
F.3d at 1205-06.

     The affidavit in support of the warrant in this case

- 33 -

(attached hereto as Exhibit 1) demonstrates the existence of probable cause that evidence of the commission of crimes in violation of 18 U.S.C. § 371, 2113, 924 and 2.  The existence of such probable cause was sufficient to authorize the searches.  See Illinois v. Gates, 462 U.S. at 238 (defining probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place").  Moreover, the affidavit provided a fair probability that evidence of the defendant's criminal activity would be found at the residence.

In any event, suppression is unnecessary because the items seized "were obtained in objectively reasonable reliance" on the warrant issued.  United States v. Leon, 468 U.S. 897, 920-26 (1984) Under Leon, even if a search warrant lacks probable cause, the exclusionary rule cannot be applied to suppress evidence obtained in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate.  Id. ("a warrant issued by a magistrate normally suffices to establish" that reliance on the warrant was objectively reasonable).  Only where the warrant was based on a "barebones" affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," can evidence be suppressed.  Id. at 915, 919, 923.[10]

---

[10]   There are four exceptions to the Leon good faith exception: (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate

Here, the warrant was not so lacking in indicia of probable cause as to render the agents' belief in its existence entirely unreasonable. This was not a case in which the warrant contained mere conclusory assertions or a single piece of evidence "which the law of the stationhouse shop would recognize as clearly insufficient." United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993). Furthermore, there is no allegation that the magistrate judge "abandoned his judicial role and failed to preform his neutral and detached function." Id. at 74 n.4. Accordingly, for this additional reason, suppression is unjustified.

> XIII.  Statements Made By Defendant On
>        Telephones He was instructed Would
>        be Recorded Should Not Be Suppressed.

After his arrest, defendant made an initial appearance before a magistrate judge and was detained. While incarcerated he used the telephone. Once a call is placed on the inmate phone from the correctional facility and picked up on the other end, the inmate states his name. A recording then states that the call is from Passaic County Jail and further states:

---

abandoned his judicial role and failed to preform his neutral and detached function; (3) the warrant was based on an affidavit "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable"; or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. See Williams, 3 F.3d at 74 n.4. The defendant has not shown that any of these exceptions apply in this case.

> This call is from a correctional institution and is
> subject to monitoring and recording.  Custom calling
> features are not allowed during this conversation.  If
> you do not wish to accept this call please hang up now.
> To accept the call press zero.

Thus, both the inmate caller and the recipient of the call are

put on specific notice that the call is subject to monitoring and

recording.  Accordingly, neither party to the call could have an

expectation of privacy, the sine quo non of a fourth amendment

violation.

In Hudson v. Palmer, 468 U.S. 517, 527-28, 104 S.Ct. 3194,

3200-01, 82 L.Ed.2d 393 (1984), the Supreme Court found that

prison inmates have no reasonable expectation of privacy.  Since

that time, Courts of Appeal have held that telephone calls from

prisoners can be monitored and recorded where notice of the

practice is made known to the inmate, the recipient of the call

or both.  See, e.g., Gilday v. DuBois, 124 F.3d 277 (1st Cir.

1997)(prison officials could monitor and tape prisoner calls),

cert. denied, 524 U.S. 918 (1998); United States v. Workman, 80

F.3d 688 (2d Cir. 688)(same); United States v. Amen, 831 F.2d 373

(2d Cir. 1987)(inmates impliedly consent to monitoring of calls

when notice is received and phone is used).

In the instant case, the defendant was given notice that his

calls were subject to being monitored and taped.  He chose to use

the phone with that knowledge and therefore cannot claim that his

words are subject to suppression. Accordingly, his motion should

be denied.

### XIV. Defendant Herrera-Genao's Request for a Hearing Regarding the Admissibility of Co-conspirator's Statements Should Be Denied.

Defendant Herrera-Genao has requested that the Court hold pretrial hearings regarding the admissibility of various statements of co-conspirators under Fed. R. Evid. 801(d)(2)(E). This request should be rejected because it is premature and nothing more than a veiled attempt to obtain impermissible discovery.

The defendant has requested a pretrial hearing on the existence of a conspiracy under theory articulated in United States v. James, 590 F.2d 575, 581 (5th Cir.), cert. denied, 442 U.S. 917 (1979), before admitting a co-conspirator's statement. The United States Supreme Court, in Bourjaily v. United States, 483 U.S. 171 (1987), rejected this procedure, and the Third Circuit has not adopted it. See United States v. DePeri, 778 F.2d 963, 981 (3d Cir. 1985), cert. denied, 475 U.S. 1110 (1986); United States v. Ammar, 714 F.2d 238, 245 (3d Cir.), cert. denied, 464 U.S. 936 (1983); United States v. Continental Group, Inc., 603 F.2d 444, 456 (3d Cir. 1979), cert. denied, 444 U.S. 1032 (1980). Therefore, the request for a so-called James hearing should be denied.

In United States v. Ammar, 714 F.2d at 245, the defendants,

- 37 -

relying upon <u>James</u>, contended that the court should hold a
hearing before allowing the introduction of any co-conspirator
statements at trial.  The asserted purpose of the hearing was to
establish the existence of the alleged conspiracy, independent of
the proffered hearsay evidence.  In affirming the district
court's decision not to conduct such a "mini-trial," the Court of
Appeals stated that conducting such a hearing was neither
preferred nor mandatory and that the "order of proof at trial"
was a matter committed to the sound discretion of the trial
judge.  <u>Ammar</u>, 714 F.2d at 246; <u>Continental Group</u>, 603 F.2d at
456.  The court also noted that, in <u>Continental Group</u>, it had
been proper for the trial court to admit co-conspirator
statements without a prior showing of a conspiracy, subject to
the requirement that the government make such a showing at the
close of its case.  <u>Ammar</u>, 714 F.2d at 245-46; <u>see</u> <u>United States
v. Bey</u>, 437 F.2d 188, 191 (3d Cir. 1971); <u>United States v.
Feliziani</u>, 472 F. Supp. 1037, 1046 (E.D. Pa. 1979), <u>aff'd</u>, 622
F.2d 580 (3d Cir. 1980); <u>United States v. Sinclair</u>, 433 F. Supp.
1180, 1190-91 (D. Del.), <u>aff'd</u>, 566 F.2d 1171 (3d Cir. 1977).
Further, the Circuit in <u>Ammar</u> echoed the court's holding that
Fed. R. Evid. 104 did not require a pretrial hearing.

More recently, the United States Supreme Court held that the
content of co-conspirator statements may be considered in
determining their admissibility at trial.  Significantly, the

- 38 -

Court suggested that this determination is best made at the time of trial when the full context of the statement is before the trial court. <u>See</u> <u>Bourjaily</u>, 483 U.S. 171.

The same considerations should apply in this case. Here, the defendants are before the Court and the evidence of their participation in the conspiracy will come from the witnesses who will testify at trial. This trial should not be long. As a result, to conduct a pretrial hearing on this matter will, in effect, require substantial duplication of the identical evidence which will be put before the Court during trial -- specifically the kind of "mini-trial" of which the appellate court disapproved in <u>Continental Group</u>.

Because there is no requirement under either the case law or the rules of evidence that the Court conduct such a pretrial hearing, this Court should decline to do so, and deny the defendant's request for same.

XV.   Defendant's Request for an <u>In</u> <u>Limine</u>
      Ruling Regarding the Admissibility
      of His Prior Convictions is Premature
      <u>and Should be Denied.</u>

Defendant Herrera-Genao, like defendants Berrios and Lynn before him, seeks an <u>in</u> <u>limine</u> ruling from the Court regarding the admissibility of his prior convictions, if any, were he to

take the witness stand in his own defense[11].  Such a request is premature at this time and should be denied.

The defendant is asking the Court to rule on an evidentiary issue in a vacuum, without the full benefit of the trial record. Furthermore, assuming arguendo that the prior convictions are in any way prejudicial, without a full factual context, the Court is without a framework within which to balance the probative value of this evidence.

In Luce v. United States, 469 U.S. 38 (1984), the Supreme Court held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. at 464.  The Court, in addressing the question of admitting impeachment material of a prior conviction under Rule 609(a)(1) noted that a balancing test was required and that "[t]o perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify." Id. At 463.  The Court also noted that a mere proffer by the defendant as to what he expected to testify to was insufficient as "his trial testimony could, for any number of reasons, differ from the proffer." Id. at 463 n.5.  Finally, quoting New Jersey v.

---

[11] Defendant also seeks a ruling regarding the use of his prior convictions, if any, during the Government's case-in-chief. To the extent the United States will seek to introduce evidence pursuant to Rule 404(b) it will make an appropriate and timely motion.

Portash, 440 U.S. 450 (1979), the Luce Court held:

> The preferred method for raising claims such as
> petitioner's would be for the defendant to take the
> stand and appeal a subsequent conviction.  Only in this
> way may the claim be presented to reviewing court in a
> concrete factual context.

Luce, 469 U.S. at 464.  Thus, defendant's motion in this matter

will not be ripe unless and until he seeks to testify at trial.

Courts that have faced this question have held, consistent

with Luce, that the defendant must testify before the motion to

exclude prior convictions can be decided.  See United States v.

Avant, 1992 WL 80943 (D. Or. April 10, 1992); United States v.

Chew, 1993 WL 38400 (E.D. Pa. Feb. 12, 1993), aff'd 9 F.3d 1541

(3d Cir. 1993).[12]  Accordingly, a ruling at this time would be

premature and the defendant's request should be denied.


    XVI.  The Matter Should Not be Severed.

        Defendant Herrera-Genao moves for severance arguing

that introduction of redacted statements that co-defendants made

to law enforcement officials will run afoul of Bruton v. United

States, 391 U.S. 123 (1968).  Defendant attacks the statements

---

[12] Other Courts facing motions in limine for the exclusion of
prior convictions have ruled the prior convictions admissible
even before the defendant's having taken the witness stand.  See
United States v, Jackson, 1995 WL 337067 (N.D. Ill. May 31,
1995)(admitting prior drug conviction in prosecution for
telemarketing fraud); United States v. Coleman, 1991 WL
277334(D.D.C. Dec. 13, 1991)(permitting prior narcotics
conviction in prosecution for narcotics distribution).

generally and does not identify any particular problem areas.
Indeed, defendant has not offered anything by way of complaint as
to how the statements cannot be redacted.  The Government
believes that the statements can be properly redacted in
accordance with Bruton and its progeny and therefore defendant's
motion should be denied with leave to replead if the redactions
offered by the United Stats are not acceptable.  On April 4,
2007, Lynn made a post arrest statement.  After his arrest on
April 5, Herrera-Genao also made a detailed post-arrest
statement.

        To avoid any violation of Bruton, the United States
intends to redact from both statements all specific references to
co-defendants.  In place of their names, the Government will
substitute general terms, such as "another person", "another
guy", or "a second or third person".  The Government submits
herewith attached as Exhibits 2 and 3 initial redacted versions
for the Court.

    The Government intends to introduce the redacted statements
at trial as evidence solely against the defendants who made the
statements.  The Government will also join in any request that
the Court give a limiting instruction to this effect at trial.
See Richardson v. Marsh, 481 U.S. 200, 211 (1987) (where
ascertaining identity of co-defendant in redacted statement
requires an inference drawn from linking other evidence to the

- 42 -

statement, the risk that a jury cannot follow limiting
instructions is not sufficiently substantial to violate Sixth
Amendment); Priester v. Vaughn, 382 F.3d 394, 400-401 (3d Cir.
2004) (admission of co-defendant's statement "did not run afoul
of the Sixth Amendment" where it was "carefully" redacted and
court "gave appropriate limiting instructions before the
admission of the statement and during jury instructions"), cert.
denied, 125 S.Ct. 974 (2005); United States v. Belle, 593 F.2d
487, 493 (3d Cir.) (proper to admit statements of co-defendant at
joint trial where "all references to complaining defendant have
been redacted, at least if the redacted versions do not
explicitly suggest the participation of the complaining
defendant."), cert. denied, 442 U.S. 911 (1979).  In addition,
the Government is prepared to respond to any specific objections
defendant may have regarding the redactions.

     The precautions taken in this case fully comply with Bruton
and later cases.  Bruton bars admission at a joint trial of a co-
defendants' statement that is "powerfully incriminating" to the
defendant.  Bruton v. United States, 391 U.S. at 135-36.  In that
two-defendant case, the Government introduced a co-defendant's
confession, which stated that both the declarant and Bruton
committed a robbery together.  The Supreme Court held that
admission of the express statement violated Bruton's Sixth
Amendment right to cross-examine witnesses.

- 43 -

The Court visited the confrontation clause again in Richardson v. Marsh, 481 U.S. 200 (1987).  In Richardson, the Government redacted a confession to omit all reference to co-defendant Marsh.  In the context of other trial evidence, though, the statement could have helped the jury conclude that Marsh was a participant in the crime.  The Supreme Court rejected Marsh's challenge to the introduction of this statement and refused to extend Bruton to such a situation.  Unlike the confession in Bruton, which "expressly implicat[ed]" the defendant, the statement in Richardson "was not incriminating on its face, and became so only when linked" with other evidence.  481 U.S. at 208.[13],[14]

More recently, in Gray v. Maryland, 523 U.S. 185 (1998), the Supreme Court held that when a redacted confession replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, the statement is barred under Bruton's protective rule.  523 U.S. at 192.  The Court reasoned that statements redacted in that fashion "obviously refer directly to someone, often obviously the

---

[13]   Richardson expressed no opinion on the admissibility of a confession in which the defendant's name has been replaced with a neutral pronoun.  481 U.S. at 211 n.5.

[14]   See also United States v. Belle, 593 F.2d 487, 493 (3d Cir. 1979) (en banc) ("[w]hen a co-defendant's extrajudicial statement does not directly implicate the defendant, however, the Bruton rule does not come into play"), cert. denied, 442 U.S. 911 (1979).

- 44 -

defendant"; and such a prominent deletion "may well call the juror's attention specially to the removed name."  Id. at 192-97.

Substituting a neutral pronoun for a named co-defendant raises none of these problems.  A statement redacted in this way does not implicate anyone on its face.  Perhaps more importantly, it does not expressly point to a particular defendant.  Nor does substitution invite jurors to speculate about a removed reference; by contrast, the substituted words leave no blatant or obvious gap.[15]

Since Gray, several courts have approved of the practice of substituting neutral words or pronouns for a named co-defendant. See United States v. Vejar-Urias, 165 F.3d 337, 340 (5th Cir. 1999) (use of "someone");  United States v. Edwards, 159 F.3d 1117, 1124-26 (8th Cir. 1998) (use of "we" and "they"); United States v. Cambrelen, 18 F.Supp.2d 226, 229-30 (E.D.N.Y. 1998) (use of "guy," "guys," or "the guys"); But see United States v. Eskridge, 164 F.3d 1042, 1043-44 (7th Cir. 1998) (use of "another" together with prosecutor's mistake in closing argument,

---

[15] Nor do neutral references identify anyone by race, age, nickname, or some other recognizable characteristic.  See Gray v. Maryland, 118 S.Ct. at 1156;  Harrington v. California, 395 U.S. 250 (1969) (reference in co-defendant's statement to "the white guy" where defendant was only white person among four defendants); United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.), cert. denied, 394 U.S. 986 (1978);  United States v. Holleman, 575 F.2d 139, 142 (7th Cir. 1978).

referring to defendant by name, found violative of <u>Bruton</u> but harmless error).

Defendant is left to complain that neutral references might implicate him when linked to other evidence. But "Richardson placed outside the scope of <u>Bruton's</u> rule those statements that incriminate inferentially." <u>Gray v. Maryland</u>, 523 U.S. at 195. And the kind of inferences involved in <u>Richardson</u>--"statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial'", <u>id</u>. at 196 (citations omitted)--are the very type of inferences that might be raised here.

Defendant's simple answer is to sever this case into different trials. But doing so is far from simple, as the Supreme Court explained in <u>Richardson</u>.

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.

481 U.S. at 210. Joint trials, undertaken with the protections in place here, "generally serve the interests of justice". <u>Id</u>.

Because defendant has failed to show substantial prejudice resulting from a joint trial, and because the proposed redacted

- 46 -

statements of defendant Lynn does not implicate anyone on its face and is not "powerfully incriminating", there is no basis for severance.  Defendant's motion for severance should therefore be denied.

> XVII.    The Warrantless Search of the Defendant
>          Herrera-Genao Incident To Arrest Was Proper.

Defendant Herrera-Genao cites no facts and no law that would warrant suppression of the fruits of the search of his person incident to his valid arrest.  Indeed, the cases cited in his memorandum of law deal largely with searches of automobiles. Here, though, defendant seeks to redefine Fourth Amendment jurispridence in arguing that the search of his person incident to an arrest he does not claim was unlawful, was improper.  His motion in this regard should be denied.

Warrantless searches of individuals incident to their valid arrest are valid. In United States V. Robinson, 414 U.S. 218, 235 (1973), the Court held: "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that amendment."   In New York v. Belton, 453 U.S. 454 (1981), the Supreme Court clarified the scope of the search that could take place holding:

> that when a policeman has made a lawful custodial
> arrest of the occupant of an automobile, he may, as a
> contemporaneous incident of that arrest, search the

- 47 -

passenger compartment of that automobile.  It follows
from that conclusion that the police may also examine
the contents of any containers found within the
passenger compartment, for if the passenger compartment
is within reach of the arrestee, so also will
containers be within his reach.

Id. at 460 (footnotes omitted).  Thus, the search of Herrera-
Genao's person was properly executed without a warrant and his
motion should be denied.


        XVIII.   The Automobile Searches Should Not Be Suppressed.

    Defendant Herrera-Genao "seeks to suppress the warrantless
search of the automobiles allegedly used by the defendant and the
co-conspirators in this matter."  (Herrera-Genao Mem. at p. 24).
However, nowhere does defendant specify what automobiles he
claims were searched improperly or without a warrant.  Without
this basic knowledge it is impossible to answer whether a warrant
was obtained[16], why a warrant was not necessary or even whether
defendant has standing to contest a search.  For this reason
alone, defendant's motion should be denied.


        XIX. The Defendant Should not be Permitted
             to File Additional Motions.

    Defendant Herrera-Genao has moved for leave to file

---

[16] The Government obtained search warrants for a black 2000
Honda Civic bearing New Jersey license plate number JMU-94G and a
White 1999 Acura 3.2 Tl Sedan bearing New Jersey license plat
number BB5-7BT.

- 48 -

additional motions.  Because all discovery that the United States
is obligated to provide the defendant has been supplied he is in
possession of all of the information upon which he could base
motions.  Defendant has had sufficient time to review the
material and to the extent he seeks to file additional motions
based on these or other materials, leave of Court should be
sought prior to any such filing.


XX.   The Defendants Should Be Ordered to
      Provide Reciprocal Discovery to the
      United States.

The right of the United States to reciprocal discovery from
defendants is firmly established in Rule 16(b)(1)(A) and (B) of
the Federal Rules of Criminal Procedure.  The former provision
allows the United States, upon compliance with a legitimate
request by a defendant for similar material, to

> inspect and copy or photograph books, papers,
> documents, photographs, tangible objects, or copies or
> portions thereof, which are within the possession,
> custody, or control of the defendant and which the
> defendant intends to introduce as evidence in chief at
> trial.

Subsection (b)(1)(B) mandates reciprocal discovery of scientific
tests.  Under the clear language of this rule, courts uniformly
have allowed reciprocal discovery.  See, e.g., United States v.
Bump, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal
disclosure over defendant's objection that it would violate his

- 49 -

constitutional rights); <u>United States v. Sherman</u>, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).

       To date, the United States has not received any reciprocal discovery from the defendant.  Because discovery has been made available to the defendant, the United States is entitled, <u>pre-trial</u>, to reciprocal discovery under Rule 16(b) and the Court should so direct disclosure of discoverable information forthwith.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motions and grant the cross-motion of the United States for reciprocal discovery.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

s/Kevin M. O'Dowd

By: Kevin M. O'Dowd
Assistant U.S. Attorney

s/Charles B. McKenna

By: Charles B. McKenna
Assistant U.S. Attorney

Date: February 15, 2008

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STATE OF NEW JERSEY    :
                         : ss.  A F F I D A V I T
COUNTY OF ESSEX      :

RONALD A. LYMAN, being of age and being duly sworn according to law,
hereby states that:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI")
assigned to the Newark (New Jersey) division, and am empowered by law to investigate
and to make arrests for offenses involving, among other things, involving theft and
robbery from federally insured banks in violation of 18 U.S.C. § 2113, assault on and
murder of federal officers in violation of 18 U.S.C. §§ 111 and 1114, Racketeer
Influenced and Corrupt Organizations Act, in violation of 18 U.S.C. § 1962 and 1963.
using or carrying a weapon during or in relation to a crime of violence, in violation of 18
U.S.C. § 924(c) and conspiring to commit these offenses in violation of 18 U.S.C. § 371
and 1962(d). Except where otherwise noted, the information set forth in this affidavit
has been provided to me directly or indirectly by Special Agents of the FBI or other law
enforcement officers. Unless otherwise noted, all statements set forth herein which are
attributable to witnesses are stated only in substance and in part. Similarly, information
resulting from surveillance, except where otherwise indicated, does not set forth my
personal observations but rather has been provided directly or indirectly through other
law enforcement officers who conducted such surveillance.

2.     I have been employed as a Special Agent of the FBI for approximately 18
years during which time I have participated in over 100 search warrants. I am the

Group Supervisor of a violent crime criminal enterprise task force and have been involved in numerous investigations involving bank robbery, racketeering, shootings and other crimes of violence.

3.      I submit this affidavit in support of the application of the United States for a warrant to search:

1.      The residence of WILFREDO BERRIOS, 1 Welton Street, New Brunswick, New Jersey, which is a multi-family, two story tan building with a brown door. On top of the door is the number "1" in black. The dwelling is located on the corner of Welton Street and Throop Avenue;

2.      The residence of MICHAEL CRUZ, 167 Comstock Street, New Brunswick, New Jersey, which is an attached, two story dwelling, blue in color with white trim and a white garage door. The numbers "1-6-7" are in black letters on side of the front door. The dwelling is located on the corner of Comstock Street and Remsen Avenue;

3.      The residence of FRANCISCO J. HERRERA-GENAO, 146 Lee Street, New Brunswick, New Jersey, which is a two story white house with black trim. There are steps that lead to a front door, on top of the door is the numbers "1-4-6";

4.      The residence of EFRAIN LYNN, JR., 68 Comstock Street, New Brunswick, New Jersey, which is a two story tan building with green shutters. There are steps that lead to a white front door, on top of the door is the numbers "6-8". Behind the residence is a detached single car garage;

2

5.   A white 1999 Acura 3.2 TL sedan bearing New Jersey license plate number BB5-7BT, VIN UA5640XA037867 ("the White Acura");

6.   A black 2000 Honda Civic bearing New Jersey license plate number JMU-94G, VIN 1HGEJ8245YL020435 ("the Black Honda");

7.   The voicemail-box, voicemail and text messages maintained for a Nextel mobile telephone number 732-558-2518 subscribed to by Wilfedo Berrios ("the Berrios Mobile Phone");

8.   A Sprint / Nextel mobile telephone utilizing telephone number 901-214-8372 and subscribed to by V. Hernandez seized from inside the White Acura on April 5, 2007, and the voicemail-box, voicemail and text messages maintained for that mobile telephone ("the Hernandez Mobile Phone");

4.   I am familiar with the contents of this affidavit and the facts and circumstances of this investigation based upon my own participation in the investigation, a review of the files and reports of other federal agents and local law enforcement officers and detectives, as well as my discussions with agents and law enforcement officers and other persons who have knowledge of the facts of this case who have reported to me. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

5.   On or about February 8, 2007, at approximately 9:30 a.m., a masked gunman robbed the Commerce Bank located at 1068 Stelton Road, Piscataway, New Jersey. The robber was wearing dark colored clothing and a ski-mask.

3

6.     On or about February 16, 2007, at approximately 3:49 p.m., masked gunmen robbed the Bank of America located at 639 Route 18 South, East Brunswick, New Jersey. The robbers were wearing dark colored clothing and ski-masks.

7.     On or about March 2, 2007, at approximately 1:45 p.m., two masked co-conspirators committed an armed robbery of the Bank of America located at 1100 Highway 35, Ocean Township, New Jersey. After committing the robbery both subjects were seen getting into a Honda Civic that had previously been reported stolen. This Honda Civic was later recovered in a parking lot located at 2361 Highway 66, in Ocean Township, approximately one-half mile from the bank. The robbers each wore dark colored clothing and ski-mask.

8.     A video tape of the parking lot described above revealed that the Honda Civic used during the robbery had been in the same parking lot where it was later recovered approximately 45 minutes prior to the robbery. The video also revealed a blue Nissan Sentra driving through the rear of the parking lot, with the Honda used in the robbery driving directly behind, and in close proximity to, the Nissan. The two cars were the only vehicles in that section of the parking lot and were driving in close proximity to one another, one directly behind the other. Special Agents of the FBI believe that the blue Nissan was used to transport the bank robbers from the parking lot after they abandoned the Honda, while in flight from the robbery.

9.     The blue Nissan Sentra was identified and located at a car rental agency in Edison, New Jersey. Rental records show that it was rented two days before the robbery and returned three days after the robbery. Rental records further show that the car was rented by WILFREDO BERRIOS.

4

10. On or about March 16, 2007, at approximately 2:45 p.m., the Bank of America, 24 Summerfield Road, South Brunswick, New Jersey was robbed by three individuals wearing masks and carrying guns, including two assault rifles and one handgun. Various of the robbers were wearing hooded sweatshirts, dark trench-coats, face-masks and/or baseball hats. One of the robbers fired a shot from the handgun during the robbery, resulting in an injury to one to the tellers.

11. All four of the bank robberies set forth above involved masked gunmen and in three of the robberies shots were fired and bullet casings were recovered. An examination of the bullet casings from the separate robberies where shots were fired revealed that they were all from the same .380 handgun. During these four robberies, two individuals have been injured thus far by ricocheting bullets and several individuals have been held at close gunpoint.

12. In addition, in all four of the bank robberies, Honda automobiles were stolen by the robbers and utilized in the robbery. All four of the Hondas which were recovered following the bank robberies had "popped" ignitions. This indicated that the ignition column had been broken by a tool in order to start the vehicle.

13. Additionally, assault weapons were utilized by the robbers of the last three robberies.

14. Shortly after the robbery of the COMMERCE BANK on February 8, 2007, law enforcement began an investigation to identify the individuals responsible. The locations of the victim banks in the first two robberies as well as the sites where the Honda Civics were stolen focused law enforcement's efforts in the area between Franklin Township and Piscataway, New Jersey. Additional information developed as a

5

result of witness statements and video surveillance images, led law enforcement to believe that WILFREDO BERRIOS was involved in both the car thefts and the robberies.

15.    A review of Public Source Records as well as employment records and contact with various law enforcement officers reveals that WILFREDO BERRIOS is an employee of Church and Dwight located in North Brunswick, New Jersey, where he works out of a warehouse. Between 2004 and 2006 FRANCISCO HERRERA-GENAO and EFRAIN LYNN were employed as security guards for Motivated Security Service. Motivated Security Service provides security for Church and Dwight. Both HERRERA-GENAO and LYNN were assigned to Church and Dwight. MICHAEL CRUZ was previously employed at Motivated Security Services as a security guard assigned to the Church and Dwight warehouse in North Brunswick, New Jersey.

16.    A review of EFRAIN LYNN's Motivated Security Service's application revealed that LYNN placed MICHAEL CRUZ as a reference and noted that he had known MATIAS CRUZ all of his life.

17.    On March 15, 2007, EFRAIN LYNN and MICHAEL CRUZ were in a vehicle stopped by New Brunswick Police. MICHAEL CRUZ was issued a speeding ticket on that date.

18.    ELIMANUEL AVILES has been observed by law enforcement in the company FRANCISCO HERRERA-GENAO and MICHAEL CRUZ as recently as March 24, 2007, at approximately 2:20 a.m. in North Brunswick, New Jersey.

19.    A car utilized in the March 2, 2007, robbery was rented by WILFREDO BERRIOS.

6

20.     Also on April 4, 2007, MICHAEL CRUZ purchased a quantity of .380 caliber ammunition from Dicks Sporting Goods on Route 18 in East Brunswick, New Jersey.  Ammunition recovered from three of the prior robberies was from a .380 weapon.

21.     On April 5, 2007, surveillance was instituted on subject WILFREDO BERRIOS at 1 Welton Street, New Brunswick, New Jersey.  At approximately 9:00 a.m., WILFREDO BERRIOS was observed entering the White Acura, bearing New Jersey license BB57BT.  This vehicle was then observed traveling to 146 Lee Avenue, New Brunswick, at approximately 9:15 a.m.  Subsequently three individuals were observed entering the White Acura.

22.     At approximately 10:30 a.m. the White Acura was observed in the parking lot in the vicinity of Bloomingdales Department Store, Commons Way, Bridgewater, New Jersey  .  Shortly thereafter, the Black Honda was parked adjacent to the White Acura.

23.     At approximately 10:50 a.m., both the Black Honda (subsequently found to have been stolen earlier in the day from the Bridgewater Mall) and the White Acura were observed traveling in tandem to the ShopRite located on Route 22 in the vicinity of the Raritan Valley Community College.

24.     Shortly thereafter, the three individuals left the Black Honda at the ShopRite and were observed in the White Acura traveling westbound on Route 22 in the vicinity of several banks.

25.     At approximately 11:19 a.m. on April 5, 2007, the White Acura was observed back at the ShopRite parking lot in the vicinity of the black Honda.  Shortly

7

thereafter, the Black Honda and White Acura were parked side-by-side and all individuals were outside the vehicles. Shortly after that the trunk of the White Acura was opened and two individuals were observed getting into the Black Honda.

26.    At approximately 11:30 a.m., the Black Honda and White Acura were observed traveling in tandem westbound on Route 22. At some point the White Acura exited Route 22 and parked in a parking lot within view of a PNC Bank located at 3510 U.S. Route 22 West, Readington, New Jersey. The Black Honda was observed traveling to the PNC Bank with two individuals in the vehicle.

27.    At that point FBI Agents approached the Black Honda in an effort to prevent another bank robbery and to arrest the subjects. WILFREDO BERRIOS was arrested at the Black Honda. FRANCISO J. HERRERA-GENEA fled on foot into a wooded area nearby. Located inside the vehicle in the front seat of floor was a handgun, described as a Hipoint Pistol. In the back seat was a long-barreled weapon. Also observed was a long bag of the type that could contain a weapon.

28.    At approximately the same time that the Black Honda was approached by FBI agents, additional FBI Agents approached the White Acura and attempted to arrest the male who had driven it there. At this time one FBI Agent was shot and he subsequently died after being airlifted to the hospital. The driver of the White Acura was arrested and identified as MICHAEL CRUZ.

29.    After his arrest, MICHAEL CRUZ was advised of his rights and stated in substance and in part that: the co-conspirator who ran from the White Acura FRANCISCO HERRERA; on the March 16, 2007, robbery, he (CRUZ) was the switch car driver, and that BERRIOS, HERRERA and LYNN were the masked gunmen.

8

30. On April 5, 2007, a .380 handgun and two assault rifles were recovered from the Black Honda. In addition, two ski masks were recovered, one from the Black Honda and one from the direction of flight that Herrera ran.

31. On April 5, 2007, EFRAIN LYNN had a court date in a local New Jersey. He is currently in custody in Perth Amboy on a bench warrant.

32. A check with Postal authorities indicated that WILFREDO BERRIOS was receiving mail at 1 Welton Street, New Brunswick, New Jersey, within the past two weeks. WILFREDO BERRIOS's vehicle is registered to the 1 Welton Street address. This vehicle has been observed parked at this residence on numerous occasions within the past two weeks, and surveillance has placed WILFREDO BERRIOS at that residence within the past two weeks.

33. A check with Postal authorities indicates that MICHAEL CRUZ has been receiving mail at 167 Comstock Street, New Brunswick, New Jersey within the past two weeks. Subsequent to his arrest on April 5, 2005, (and after being advised of his rights pursuant to Miranda v. Arizona), MICHAEL CRUZ admitted that he resides at 167 Comstock Street, New Brunswick, New Jersey.

34. A check with Postal authorities indicated that EFRAIN LYNN, JR., has been receiving mail at 68 Comstock Street, New Brunswick, New Jersey for the past two weeks. Subsequent to his arrest on April 5, 2005, (and after being advised of his rights pursuant to Miranda v. Arizona) MICHAEL CRUZ stated that EFRAIN LYNN, JR., resides on Comstock Street, New Brunswick, New Jersey.

35. A check with Postal authorities indicated that FRANCISCO HERRERA has been receiving mail at 146 Lee Avenue, New Brunswick, New Jersey for the past

9

two weeks. Subsequent to his arrest on 04/05/2005, MICHAEL CRUZ stated that FRANCISCO HERRERA resides on Lee Avenue, New Brunswick, New Jersey.

36.     In addition, the telephones may contain identifying information such as telephone number, direct connect numbers, SIM cards, Mobile Identification Numbers, Electronic Serial Numbers, IMEI numbers, address books, contact lists, call logs of outgoing, incoming and missed calls, photographs and videos, calendars, appointment books, memos and notes, organizers, text messages, voice messages or recordings and voicemails maintained by the appropriate telephone service provider.

37.     Voicemails and text messages may also be maintained by Sprint / Nextel Communications, the service provider for the Berrios and Hernandez Mobile Phones.

38.     It is also my experience that telephone company records, including billing information, cell site date, and toll records, once associated with a particular defendant are very useful tools in corroborating other information and in helping to determine the involvement of various participants in the offense.

39.     Authorization is sought in this application to seize the Hernandez Mobile Phone in order to examine those items for evidence. If it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time.

40.     The evidence sought to be seized consists of the all electronic data contained within the Hernandez Mobile Phone, access to the voicemail-box and all voicemail and text messages maintained by the appropriate service provider for the Hernandez Mobile Phone and the Berrios Mobile Phone (in this case believed to be

10

Nextel Communications, a/k/a "Sprint Nextel") all of which represent the fruits, instrumentalities and/or evidence of crimes against the United States.

41.     I have also learned that the owners of cellular telephones may have the option of creating a password that must be used to gain entry into either the entire data base or particular items therein. If the password is unknown, the manufacturer of the machine is able to override the security mechanism and gain entry into the machine's memory. In the event that the Hernandez Mobile Telephone has a password in effect, and if the federal law enforcement officers are unable to override the password, it is respectfully requested that the Court permit Special Agents of the FBI to have a representative of the manufacturer or another expert to override the password so that Government agents can gain entry into the contents of the machines.

42.     Similarly, it is requested that the Court permit Special Agents of the FBI to have a representative of the cellular telephone manufacturer and/or service provider examine the contents of the cellular telephone to identify the electronic serial number and examine its contents so that further investigation regarding its usage may be conducted.

43.     Similarly, the government may require the assistance of the telephone service provider, e.g., Nextel Communications, a/k/a Sprint Nextel, in order to access the Hernandez Mobile Phone and the Berrios Mobile Phone's voicemail-box, voicemails or text messages. Specifically, this application seeks to have the appropriate service provider provide access to the government to the voicemail box (and any voicemail and text messages) of the Hernandez Mobile Phone and the Berrios Mobile Phone's.

11

44.     Searching this electronic data for the evidence described in Attachment B may require a range of data analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, I request permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

45.     Based on the foregoing, I have probable cause to believe that the premises described in paragraph 3 of this affidavit contain evidence of violations of federal law, including Title 18, United States Code, Sections 2113, 111, 1114, 1962, 1963, 924(c), 371 and 2. This evidence includes masks, ski-masks, hats, gloves, sweatshirts, jackets and other clothing and shoes worn by, and bags used or carried by the bank robbers and currency or money, bait money taken from the banks, deposit slips; mobile telephones, walkie-talkie radios; and any and all notes, letters, records, maps, and documents as wells as guns, ammunition and receipts, evidencing a plan or scheme to commit a robbery or robberies against any bank, which constitute evidence of bank robbery, assault on and murder of federal officers, racketeering, using or carrying a weapon during or in relation to a crime of violence, and conspiring to commit these offenses.

12

46.     This application also seeks authorization to seize all electronic data maintained or stored within the Hernandez Mobile Phone and the voicemail and text messages maintained for the Hernandez Mobile Phone and the BERRIOS Mobile Phone by the appropriate service provider including Nextel Communications, a/k/a Sprint Nextel.

47.     In searching for data capable of being read, stored or interpreted by a mobile telephone, law enforcement personnel executing this search warrant may need to seize and transport the Hernandez Mobile Phone to an appropriate law enforcement laboratory for review. The Hernandez Mobile Phone will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein. In searching the data, the computer personnel may examine all of the data contained in the Hernandez Mobile Phone to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time.

48.     In addition to the specific facts and circumstances set forth herein, this belief is based upon my law enforcement training and experience, and that of other FBI agents with whom I have been working on this investigation. This training and experience has demonstrated that people generally keep their clothing and other

13

belongings at the place they are staying at, and do not normally throw away hats, masks, or jackets even after being involved in a bank robbery.

49.     It is also respectfully requested that the Court issue an order pursuant to which the application of the United States for the warrant to search the premises described in paragraph 3 and all papers submitted in support of the application be filed under seal. The evidence to be seized and the information upon which the application is based is relevant to an ongoing investigation and premature disclosure of the affidavit and related documents may have a negative impact on other aspects of the investigation and may jeopardize the effectiveness of the investigation.

50.     WHEREFORE, I respectfully request that a search warrant be issued for the following places:

14

1.    The residence of WILFREDO BERRIOS, 1 Welton Street, New
      Brunswick, New Jersey, which is a multi-family, two story tan building with
      a brown door.  On top of the door is the number "1" in black.  The dwelling
      is located on the corner of Welton Street and Throop Avenue;

2.    The residence of MICHAEL CRUZ, 167 Comstock Street, New Brunswick,
      New Jersey, which is an attached, two story dwelling, blue in color with
      white trim and a white garage door.  The numbers "1-6-7" are in black
      letters on side of the front door.  The dwelling is located on the corner of
      Comstock Street and Remsen Avenue;

3.    The residence of FRANCISCO J. HERRERA-GENAO, 146 Lee Street,
      New Brunswick, New Jersey, which is a two story white house with black
      trim.  There are steps that lead to a front door, on top of the door is
      the numbers "1-4-6";

4.    The residence of EFRAIN LYNN, JR., 68 Comstock Street, New
      Brunswick, New Jersey, which is a two story tan building with green
      shutters.  There are steps that lead to a white front door, on top of the
      door is the numbers "6-8".  Behind the residence is a detached single car
      garage;

5.    A white 1999 Acura 3.2 TL sedan bearing New Jersey license plate
      number BB5-7BT, VIN UA5640XA037867 ("the White Acura");

6.    A black 2000 Honda Civic bearing New Jersey license plate number JMU-
      94G, VIN 1HGEJ8245YL020435 ("the Black Honda");

7.    The voicemail-box, voicemail and text messages maintained for a Nextel

15

mobile telephone number 732-558-2518 subscribed to by Wilfredo Berrios ("the Berrios Mobile Phone");

8.    A Sprint / Nextel mobile telephone utilizing telephone number 901-214-8372 and subscribed to by V. Hernandez seized from inside the White Acura on April 5, 2007, and the voicemail-box, voicemail and text messages maintained for that mobile telephone ("the Hernandez Mobile Phone");

 

 

Ronald A. Lyman, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed in my presence
this _____ day of April, 2007

HON. MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE

16

# EXHIBIT 2

LYNN admitted to being part of a group of individuals responsible for several bank robberies in New Jersey. LYNN stated that the members of the group included **himself, Fat Ass and two others.** LYNN said that **one of the two others** was the ring leader and **the other of the two** as a very active participant and **was the one** who had fired the shots during three of these robberies. Throughout the life of the conspiracy, **the two others** took the lead on the planning and set-up of the banks that were targeted. **One of the two** would discuss police response times **and he also** drove and used a black Honda Civic.

The weapons used in the execution of these bank robberies were supplied by **two others.** These consisted of a .380 handgun, an SKS assault rifle and an AK-47. LYNN was not aware of when, where or how the guns were acquired, however on one occasion, **one of the guys who provided the weapons** indicated that the guns were purchased in the "city." Based upon discussions, LYNN believed that CRUZ was responsible for the acquisition of the 7.62 and .380 ammunition for the robberies. LYNN advised that he was not aware of the extra magazines for the AK-47 or SKS assault rifles, however **one of the other guys** carried several extra magazines, up to three, for the .380 handgun. On one occasion (the East Brunswick bank robbery), LYNN was supplied with what he believed was a BB gun, which resembled a long gun. This gun was used before the assault weapons were introduced to the series of robberies.

**The two other participants** spoke of shooting the weapons in a wooded area for practice. LYNN accompanied **them** on one occasion to a remote area on New Brunswick, New Jersey near the Raritan River. On this occasion LYNN observed **one of other guys** discharge one round from one of the assault rifles and **the other guy** discharge several rounds from the other. The rounds were fired in the direction of the Route 1/Morris Goodkind Bridge.

LYNN **and two others** participated in a robbery of a Commerce Bank located in Piscataway, NJ (02/08/2007). Prior to the execution of this robbery **one of the other two participants** provided LYNN with two 'throw away' cellular telephones. **He** instructed LYNN that the first telephone was for LYNN to receive a call from **him** just before **the two others** were to enter the bank to execute the robbery. Upon receiving the call from **the guy who gave LYNN the phone,** LYNN was then instructed to call '9-1-1' and to report a robbery at a location different from that of the targeted Commerce Bank. **The same guy** told LYNN that the purpose of this telephone call was to divert law enforcement responders away from the Commerce Bank. After receiving the instruction, LYNN **and the two other participants** traveled in one of the **other's** black Honda to a Quick Chek store located near River Road. LYNN was dropped off at this location with the two phones, and then **the other two** drove in the direction of the Commerce Bank. LYNN, as planned, received a telephone call from **one of the two guys** on the first telephone, which was the signal for LYNN to call 9-1-1. LYNN was nervous about making the call and ultimately did not make the call. LYNN threw the 9-1-1 phone into the river to ensure that **the other guys** would not be able to look at the outgoing call log and determine that the call was not made. As planned, LYNN then walked along the river to a park where **the other two** picked him up in the same black Honda. The three then traveled to **one of the other guys' houses** where the proceeds were split. LYNN lied to **the other two,** telling them that he did

make th call to 9-1-1 and was paid $200 from the proceeds of the bank robbery. Furthermore, **One of the other guys** told LYNN that he had discharged his weapon upon entering the bank. LYNN recalls that **the guy** was wearing a grey 'New York' sweater with yellow lettering.

LYNN **and two others** also participated in a bank robbery of a bank on Route 18 in East Brunswick, NJ (02/16/2007). **One of the guys** stated that he would remain in his black Honda and act as a look-out, while **the other guy** and LYNN drove to the bank in a stolen Honda and enter the bank. **The one remaining in the car** would then pick up LYNN **and the other guy** at the predetermined location of a Pep Boys parking lot after the robbery. LYNN **and one of the two guys** drove to the rear entrance of the bank in a stolen Honda. **The guy with LYNN** exited the vehicle and entered the bank immediately upon arrival and LYNN, as planned, a couple of seconds later. **The guy who went into the bank first** was armed with a handgun **and upon entering the bank,** traveled to the left once inside the doors. A short time later, LYNN entered the bank and was armed with a 'BB' rifle and what appeared to be a 'banana' magazine. While occupying a position near the doorway, LYNN observed women at several desks toward the right side of the bank and told them to keep their hands up. LYNN also observed an elderly woman customer and, showing concern, asked if she had heart problems. Not recalling her response, LYNN told her not to worry because he didn't come to hurt anyone. While in the bank, **the other guy** discharged his weapon. LYNN could not observe **the other guy's** actions in the bank. LYNN also recalls a bank employee, dressed in a bright red shirt, with his hands up, saying "I'm not looking at you!" LYNN and **the other guy** exited the bank together, entered the stolen vehicle and, with LYNN driving, traveled back to the Pep Boys parking lot using back roads and pulled into a parking spot. **The third guy** then approached in his black Honda, and the three drove **in the black Honda** to LYNN's residence located at 68 Comstock Street, New Brunswick, NJ where the proceeds were split. LYNN **and the guy he had entered the bank with** received approximately $11,000 each, while **the driver** received only $3,000 - $4,000 since he did not enter the bank. LYNN advised that he took a more active role in this robbery due to **the fact that the other two guys** approached LYNN after the previous robbery, during which they discussed the success of that robbery and asked LYNN if he wanted a bigger role.

LYNN **and two others** also participated in a robbery of a Bank of America in Ocean Township, NJ (03/02/2007). Base don discussions with **the other two,** LYNN believed that they had previously looked at this bank in anticipation of executing a bank robbery at this location. On the day of this robbery, and, as instructed by **one of the two other guys,** LYNN picked up a previously stolen red Honda bearing Pennsylvania license plates that was parked on Carmen Street, near Welton Street, in New Brunswick, NJ. A flat0head screwdriver was already in the ignition when LYNN entered the stolen vehicle. LYNN, driving the stolen Honda, then followed **the other two guys,** who were driving a bright blue Nissan, along Route 18, heading south, and eventually to a Sears parking lot where they arrived at approximately 11: AM. **All three of them** then traveled together in the Nissan, with weapons in the trunk, to the bank in order to do a 'drive by.' A NJ state Police vehicle was parked at a nearby corner and the three then traveled to the Ocean Township Police Department. From there, they traveled back to the bank while timing the trip in order to estimate the department's response time. As they arrived back at the bank, the NJ State Police vehicle was observed departing the area. The three then returned to the Sears parking lot. Since he did not want to enter the bank, LYNN waited at the Sears in the Nissan

while **the other two** departed for the bank in the stolen Honda. LYNN did not stay stationary during the robbery, fearing that if he stayed stagnant in his vehicle, he may attract attention. LYNN drove around the parking lot and met up with the stolen Honda near the same Sears parking lot location where they had left. Upon returning, **the other two guys** entered the passenger area of the Nissan, with their weapons, and they departed with LYNN driving. At some point on the highway (18), LYNN pulled to the shoulder of the street, at which point **one of the other two** placed the weapons in the trunk of the vehicle and took over as the driver. The three then traveled to **one of their homes**. Leaving the weapons in the vehicle, the three entered the residence where the proceeds were split. LYNN received $1,500 and **the other two** split the balance. The weapons utilized during this robbery were initially carried in a yellow bag. Also during this robbery, LYNN was wearing a tan jacket, dark blue jeans with tan markings and tan work boots.

LYNN, MICHAEL CRUZ, AKA 'Fat Ass' **and two others** participated in a bank robbery in South Brunswick, NJ (03/16/2007). **The two others** spoke of having 'scoped out' the bank, prior to the robbery. During this robbery, LYNN drove with **another** to the bank in a stolen car. LYNN was given either an AK-47 or SKS assault rifle. CRUZ was driving a Chrysler **dropped off another guy** at a street corner located near the bank. **Two of the guys** discussed the plans to rob the bank, giving LYNN the assignment was to grab the bank manager and position himself near the large safe which CRUZ advised would be open. CRUZ then provided a physical description of the bank manager, describing her as a white female with short, shoulder length hair. LYNN put on a black trench coat, that he found in the stolen vehicle, as well as a ski mask that had one large opening for both eyes. **One of the other guys** then, armed with a handgun, entered the bank first followed by **the other guy**, who positioned himself by the ATM. LYNN was the third bank robber to enter the bank and 'froze up' once inside the bank, not grabbing or addressing the bank manager. **One of the other two guys who had entered the bank with LYNN** climbed over the teller counter, passing through a gap in the glass, and entered the teller area. LYNN followed through the glass opening. While in the teller area, **the guy who had gone through the teller glass opening first** perceived that a female Indian teller was 'playing stupid' by claiming that there was no more money. This enraged **that guy**, who, subsequently discharged his weapon into a glass bank barrier, resulting in the glass shattering. With the proceeds, **this same guy** exited the teller area by climbing back over the teller counter; LYNN then followed. LYNN **and the other two robbers** exited the bank and entered the stolen car which was unoccupied at the time of the robbery. With LYNN driving, they traveled through the bank's drive through, made a right out of the parking lot, and then a left towards the predetermined location to be picked up. The stolen vehicle was left running in the street and the three exited the vehicle to entered Chrysler vehicle being operated by CRUZ. LYNN recalls the snow falling, but does not recall that the weather inhibited their driving. Cruz then drove past the bank and ultimately to LYNN's residence at 68 Comstock, where, leaving the weapons in the vehicle, they split the proceeds. LYNN **and the two others who had entered the bank with him** received $9,000 and CRUZ received $2,000. LYNN advised that **the two other guys** recruited CRUZ for an active role in this robbery because they felt that they needed an additional person, as they intended to rob the bank's main vault in addition to the teller counter.

After discussing the South Brunswick bank robbery, LYNN was shown a surveillance

photograph obtained from the bank. LYNN acknowledged that the image in the photograph was him, specifically referencing the ski mask and trench coat.

LYNN stated that he was not present during any of the vehicle thefts. **Two other robbers** spoke of stealing cars and LYNN believed that they were responsible for their acquisition. For the Ocean Township bank robbery, **one of the other robbers** directed LYNN to the location of the stolen vehicle. LYNN had driven stolen cars on several occasions, however he did not have a valid drivers license. The stolen vehicles had their ignitions 'popped' and were able to be started with a screwdriver. LYNN stated that the cars were left running because of the time it would take to shut them off. LYNN also stated that after switching vehicles at these robberies, the driver did not speed away from the scene, but drove at a normal pace, not to attract attention to themselves.

LYNN had seen ELIMANUEL AVILES around the neighborhood but advised that he did not know him well and was not aware of AVILES involvement in the bank robberies. At some point in time, CRUZ and **one of the other bank robbers** spoke of another bank robbery that they did with just the two of them but LYNN could not recall the details.

LYNN stated that he, **and two of the others** discussed the actions that would be taken in the even of a law enforcement response during a robbery. LYNN stated that **the three of them** stated that they would "'Go at it," meaning that they would engage the police in a firefight. LYNN further stated that the three individuals referred to the movie "44 Minutes," to describe the actions that they would take in the event of a law enforcement response interrupting their bank robberies.

# EXHIBIT 3

"I robbed a Commerce Bank in Piscataway around 9:00 a.m.  This was my first bank robbery.  I did this robbery with **two others.**  I robbed this bank to pay for an operation for my brother in the Dominican Republic.

"We used a stolen Honda Civic which was taken from Franklin.  This car was parked near a house in New Brunswick.  **One of the people I was involved with** drove his black Civic and took **the other person** to a Bank.  **This other person** was to make a 911 call to the police before I robbed the bank so that they would respond to a different location.  I got a call from **that person** and **was** told that the call **had been made** and that eight police cars respond[ed].

"After I got the call from **that person,** I went into the Commerce Bank and saw a black man who was welcoming people near the front door.  I was afraid that this man would grab me so I fired one round into the ceiling from a .380 High-Point gun that I was carrying.  I then jumped over the counter and told a Filipino bank teller to put money in the bag.  I used a green laundry bag in this and all of the other robberies.

"I got about $11,000 or $12,000.  Some of this money had rubber bands wrapped around it and some was wrapped in colored wrappers.  I wore a grey hooded sweatshirt that had the words "New York" on it in yellow letters.  I wore the pants that I am currently wearing and I wore these pants in every other bank robbery.  I wore gloves and a black ski mask.  Because this was my first robbery I screwed up and forgot to pull the mask down.  Bank surveillance cameras should have a good shot of my face.

"I left the bank in the stolen Honda Civic and drove a couple of blocks away.  I lost me cell phone in the Honda Civic and it took me a couple of minutes to find it.  I had to find it because I knew that my fingerprints would be on the phone.  I dumped the Honda Civic and ran a couple of blocks and met up with **one of the people who was assisting me,** who was driving his black Honda Civic.  **He** did not want his car to be seen with the stolen car.  After **he** picked me up we drove to Johnson Park and picked up **the third person.**

"I took $6,000 or $7,000, **the second person** got $2,000 and **the third** got $500.

"I had a friend of mine steal the Honda Civic that I used in the robbery.  I paid him $200.

"I picked the Commerce Bank the day before and I told **one of the people who helped me** that I planned on robbing the bank.

"The next bank that I robbed was a Bank of America in East Brunswick on Rt. 18.  I don't remember the day but I usually did the bank robberies about two weeks apart.  I did this robbery at about 3:00 pm.  I know that **the guy who assisted me** had been at work that day because he told me.

"We used a stolen black Honda Civic HX that was stolen from South Brunswick one or

two days before. This car was stolen by the same friend that stole the car that I used in the first robbery. The person that stole the car for me thought that I was using the stolen cars for parts. I again paid him $200.

"On the day of the robbery, **one of the people assisting me** drove the stolen Honda Civic and **the second person** drove his black Honda Civic. It was dumb to use a stolen black Honda Civic and **his** black Honda Civic on the same robbery.

"On this robbery, **myself and another person** went into the bank. I was carrying my .380 handgun and **the other person** was carrying a black toy AK-47. After I went in the bank I shot one round into the ceiling. `After I fired into the ceiling a man ran out of the bank. I jumped over the teller counter and **the other person** stayed by the door of the bank. I told the tellers to put the money in the bag. A white male, who I thought was the manager, came out and asked what was going on. I told him to stay where he was. He told the tellers to give me the money. While I was in the bank I yelled "get down, get the fuck down." After jumping the counter, I dropped my gun on a desk and I had to look for it.

"During this robbery I wore the same grey hooded sweatshirt, the same pants, the same black ski mask and white gloves. This time I remembered to pull the ski mask over my face.

"After leaving the bank, we drove the stolen Honda Civic to the Pep Boys Auto Store, where we met **the third person** who was driving his black Honda Civic.

"We got about $30,000 from this robbery. **The guy who entered the bank with me** and I each got around $12,000 and **the driver** got about $6,000.

"The next robbery was in Ocean at a Bank of America. I know of this bank because I party at a house near the beach in Belmar. Four days before the robbery, **a person who assisted me** went int the bank and saw that only women were working. **That person** also saw a Commerce Bank in this area but I didn't want to rob this bank because Commerce Banks have too many windows.

"The day before the robbery, I stole a four door Honda Civic from an apartment complex in Old Bridge. We parked the stolen car in a nearby apartment complex. I stole the car with **another** who drove in a rented blue Nissan Sentra. We did not want to use **the** black Civic because **the** car has a straight pipe and a loud muffler. I used vice grips and a phillips screwdriver to steal this car.

"On the morning of the robbery, **another person** picked me up at my house. The gusn that we were going to use for this robbery were at my house in my bedroom. After **that person** picked me up we picked up **a third person** at his house. We drove to Old Bridge where **the third person** got in the stolen car and followed us to the Sears in Ocean. The guns, my .380 and a brown SKS rifle were in the trunk of the rented Nissan. **The other two people** bought the SKS rifle after the robbery because **one of them** thought he would look stupid if he was caught doing a bank robbery with a toy gun. **Those two** paid $1,400 for the SKS rifle. After buying the SKS

rifle, **one of the two** and I went to a wooded area near the Lowes Theater in New Brunswick and fired the SKS rifle and my .380 handgun at a bridge that was in the area. I gave **a fourth person** $50.00 to buy ammunition for the SKS rifle.

"Prior to the robbery, **one of the people who was helping me** went into the Bank of America to see if there waere any security guards. **One of the people assisting me** and I drove to the bank in the stolen Honda Civic and went into the bank. **The third person** drove the rented Nissan close to the bank and was supposed to alert us by using my Nextel phone if the police showed up.

"I went in the bank carrying my .380 handgun. As I went in the bank I put a round in the chamber to get everyone's attention and I put the gun on safe.

"I was wearing a grey hooded sweatshirt, the same pants, the same black ski mask and gloves. **The person who entered the bank with me** was carrying the SKS rifle and was wearing a long black jacket so that he could hide the rifle. The SKS that **the other person** was carrying was loaded.

"**The second person** went into the bank first and and jumped over the teller counter. **The second person** came in after me and as he came in he forced a man that was a cell phone into the bank. I told a black girl who worked in the bank to put the money in the same green bag that I always use. This girl seemed very scared. Even though I didn't mean it, I yelled; "if the cops get here before I leave I'll kill you."

"After leaving the bank, **the person I was with** and I drove the stolen Honda Civic back to the Sears. We got back to the Sears about thirty seconds before **the third person** got there in the Nissan. Because we were in a hurry we put the guns in the back seat of the Nissan. We late stopped on Rt. 18 and moved the guns to the trunk.

"We drove to Perth Amboy to **the third person's** girlfriend's house. She let us in but then left and went to work. After she left we split up the money. **The guy who entered the bank with me** and I got about $6,000 or $7,000 each and **the driver** got $1,800.

"The next bank that we robbed was a Bank of America in South Brunswick. We robbed this bank on a day when there was a big snow storm. Fat Ass **and a third person** rented a Jeep from a place on Rt. 1 on the day of the robbery. I stole a red Honda Accord from an apartment complex in North Brunswick the night before. **The third person** drove me in his black Honda Civic to steal the car.

"Fat Ass drove the stolen Honda Accord to an apartment complex behind the bank. **The two other people who were working with us** then drove the stolen Honda to the bank. Fat Ass drove me close to the bank and dropped me off. I went in the bank first carrying my .380 handgun. I told **the two people who went into the bank with me** that when they saw me go in the bank to come in the bank behind me. We split up like this because we thought that if we all went to the bank in the same car it would look suspicious.

"When I entered the bank I passed a white female who I thought was the manager. She entered a room and I thought that she was going to activate the alarm. I jumped over the counter and told one of the tellers to put money into the bag. I thought that she was giving me the money 'dollar by dollar" so I fired one round to make her hurry up. I thought that I was firing at the ceiling but I hit the teller glass and it shattered. I think that the teller was hit by a glass fragment because there was blood on her face.

"**One of the other people who went into the bank with me** also came behind the counter. He was carrying the brown SKS rifle and was wearing a long black jacket and gloves.

"**The third person who entered the bank with us** was carrying a black SKS rifle and was wearing no mask and a Boston Red Sox baseball cap. **That person** stayed by the front door of the bank. **The two people who entered the bank with me** bought the black SKS rifle after the last robbery for $1,400. I gave them some money to buy this rifle. Both SKS rifles were loaded. I know that they were loaded because we loaded them that morning at my house in my room.

"We got about $30,000 from this robbery. Fat Ass got $1,700, and the rest of us got about $9,500 each.

"Yesterday, we were going to rob the PNC Bank on Rt. 22. I didn't want to rob this bank because we didn't have a stolen car and I had a bad feeling about this robbery. I also didn't like the location of the bank, but **one of the guys I was working with** said he needed money and was determined to rob this bank.

"In the morning, I picked **that person** up at his house and Fat Ass at his friend's house. I was driving a white Acura TL that belongs to me but is registered in Fat Ass' name. After we picked up Fat Ass we returned to my house and picked up the guns.

"We drove to Bound Brook looking for a car to steal. We drove through an apartment complex but didn't see anything we liked. We then drove to the Bridgewater Mall and found a black Honda Civic to steal in the parking lot. I stole the car and drove it to a Shop Rite parking lot on Rt. 22. I left the stolen Honda in the lot and got into the Acura with **the other two people.** We drove on Rt. 22 past the PNC Bank, turned around, and stopped on the other side of Rt. 22 where we stopped to get something to drink and some cigarettes. We then went back to the Shop Rite and took the guns out of the trunk of the Acura and put them in the backseat of the Honda. **One of the two people** drove the Honda and I was in the front passenger seat. Fat Ass drove the Acura.

"I had decided to carry one of the SKS rifles on this robbery because I thought the rifle would scare people. **The person driving the car** was going to carry the .380 handgun. **That person** was going to get the money from the tellers and I was going to try to get the manager into the vault. During this robbery I was going to wear a red ski mask and **the other person** was going to wear a green ski mask. Fat Ass would be across the street in the Acura with my Nextel telephone and would contact us on **the other person's cell phone** after one minute and twenty

seconds. **The other person** and I were stopped before we were able to get in the bank. I was able to run into the woods where I spent the night hiding.

"I know Fat Ass to be Michael Cruz and I have known him five months.

"I spent a lot of the money from the robberies playing pool and at go-go bars. I also bought the Acura TL for $7,200 from a guy I know named Jose. I have a Civic which is in a shop **in New Brunswick near Sanford and Jersey.**

**"One of the other guys who assisted me in prior robberies** bought an Acura CL which is registered in Fat Ass' name.

"I had only intended to do one bank robbery but I got addicted.

"After the South Brunswick robbery I read in the Home News that the Indian female teller got hurt. I would like her to know that I am sorry.

"I have read this statement which consists of seven pages, and it is correct and accurate to the best of my knowledge.